In re LAGUNA BEACH MOTORS, INC., Debtor.

R. Neil RODGERS, Trustee, Plaintiff,

v.

MONAGHAN COMPANY, an Arizona General Partnership, James G. Monaghan, individually and as a General Partner of Monaghan Company, Wanda R. Monaghan, individually and as a General Partner of Monaghan Company, and Michael J. Monaghan, individually and as a General Partner of Monaghan Company, Defendant.

Bankruptcy No. SA 88–00357 JR.
Adv. No. SA 90–0075 JR.

United States Bankruptcy Court, C.D. California.

Sept. 16, 1993.

Elizabeth M. Ferency, Pagter Law Corp., Santa Ana, CA, for plaintiff.

Russell Piccoli, Russell Piccoli, Ltd., Phoenix, AZ, for defendant.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

R. Neil Rodgers ("Trustee") brought this action under § 548 of the Bankruptcy Code (the "Code") seeking to recover $307,921.55 (the "Funds") in fraudulent transfers from James, Wanda and Michael Monaghan and the Monaghan Company, an Arizona General Partnership ("Defendants"). The Monaghan Company is owned solely by the Monaghans. I granted Trustee's motion for summary judgment. Defendants asserted a § 550(b)(1) defense as good faith purchasers, who took for value and without notice. At trial, I ruled that Defendants should be treated as one legal entity for purposes of this proceeding. I also found that Defendants received the Funds in good faith and without notice. In a Memorandum Opinion dated April 14, 1993, I held that Defendants were entitled to a § 550(b)(1) defense only to the extent of $10,000 and that the Trustee was entitled to recover $297,-921.55. Defendants asked me to amend my findings of fact and conclusions of law with respect to the April 14 opinion. I took this matter under submission.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) (1991) (the district courts shall have original and exclusive jurisdiction of all cases under title 11), 28 U.S.C. § 157(a) (1991) (authorizing the district courts to refer all title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).

## STATEMENT OF FACTS

James Anderson was a minority shareholder and manager of Laguna Beach Motors ("Debtor"). Prior to filing its voluntary petition under Chapter 7 of the Code, Debtor was primarily engaged in the business of retailing automobiles.

In December 1986, James Monaghan ("Monaghan") purchased an option to buy controlling interests in four automobile dealerships from Don Dixon and John Belanger (the "Belanger Agreement"). In February 1987, with Monaghan's consent, three of the four dealerships were sold to Steven Bren. As part of the Bren transaction, Bren agreed to assume all of the debt of the one remaining dealership, Sterling Motors, Ltd., a BMW franchise in Newport Beach, California ("Sterling"). As a result, Monaghan had an option to purchase an interest in Sterling that was debt free (the "Option"). The Belanger Agreement provided that Monaghan had the right to purchase a 35% interest in Sterling for $750,-000. According to expert testimony, in 1987 Monaghan's rights in Sterling had a value of approximately $2.5 million.

In June 1987, Monaghan and Anderson entered into an agreement for Monaghan to convey his rights in Sterling to Anderson for $320,000 in cash, and a $850,000 promissory note secured by the dealership (the "Sterling Agreement"). Apparently, Anderson embezzled the Funds from Debtor to pay Defendants. Three cashiers checks sent to Defendants bore the legend "Re: Laguna Beach Motors." However, the Sterling Agreement was signed by Anderson in his individual capacity and was for his sole benefit.

The Sterling Agreement called for an escrow to be opened by Monaghan's attorneys, as the escrow agent. Further, upon the signing Anderson was required to transfer $100,000 "earnest money" to Defendants. Before September 9, 1987, Anderson and Monaghan were to perform concurrent conditions. Anderson was to transmit an additional $220,000 as a "down payment," and execute and deliver into escrow a promissory note for $850,000, secured by the Belanger stock. In return,

Monaghan was to execute and deliver into escrow an agreement of rescission, release, termination or cancellation relating to his interest in Sterling, and he was to execute an instrument of assignment of his interest in Sterling to Anderson (the "Release and Assignment Documents"). By September 9, 1987, Anderson had paid Monaghan the $100,000 in "earnest money," however neither Anderson nor Monaghan had complied with any of the other concurrent conditions under the Sterling Agreement.

The Sterling Agreement was amended on September 23, 1987 (the "Modified Sterling Agreement"). Under the terms of the Modified Sterling Agreement, the closing date was changed from September 9, 1987 to October 26, 1987. Further, Anderson was to pay Monaghan a $10,000 fee as consideration for the extension of time to perform, an additional $100,000 in "earnest money," and a reduction in the "down payment" to $120,000. Also, Anderson was required to remit $4,802.78 as interest on the down payment for the period July 9, 1987 to September 23, 1987. Thus, the terms of the purchase were changed to include $200,000 in "earnest money", a down payment of $120,000 and a secured note for $850,000.

Anderson paid Defendants the following: (1) $200,000 in "earnest money;" (2) $10,000 modification fee; (3) $93,018 towards the $120,000 down payment; and (4) $4,802.78 in interest.

In a Memorandum Opinion dated July 18, 1991, I held that Defendants were not "initial transferees" under § 550(a)(1). Additionally, on December 2, 1991, I granted summary adjudication in favor of Trustee that the transfer of the Funds to Defendants were avoidable under § 548. I issued my Memorandum Opinion on March 25, 1993, holding that Defendants were good faith purchasers for value under § 550(b)(1) to the extent of the $10,000 modification fee. On April 14, 1993, I amended the March 25, 1993 order to deny Trustee's costs and attorney's fees in this proceeding. Accordingly, I ordered Defendants to return $297,921.55 to the Trustee. On June 17, 1993, Defendants brought a

motion to amend my findings of fact and conclusions of law.

## DISCUSSION

■ Defendants argue that I should amend the April 14, 1993 Memorandum Opinion pursuant to Federal Rule Civil Procedure 59 ("FRCP"). Trustee responds that Defendants' FRCP 59 motion is untimely since it was filed 12 days after the entry of the original judgment in this case. FRCP 59 provides that:

"... [o]n a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." When a court enters an amended judgment, all time for review begins to run anew as long as the amended judgment resolves a genuine ambiguity.

*Federal Trade Com. v. Minneapolis–Honeywell, R. Co.,* 344 U.S. 206, 211–12, 73 S.Ct. 245, 249, 97 L.Ed. 245 (1952).

Here, the original judgment was entered on March 25, 1993. The original judgment was amended to address the unresolved issue of Trustee's request for fees and costs. On April 14, 1993, an amended judgment was entered finding that Trustee was not entitled to such expenses. I find that the amended judgment resolved a genuine ambiguity. Accordingly, the last date for filing a FRCP 59 motion was April 24, 1993. Since the motion was filed on April 7, 1993, it was timely.

Code § 550 specifies from whom a trustee can recover an avoidable transfer. Section 550(a)(1) allows a trustee to recover from the "initial transferee." *In re Bullion Reserve,* 922 F.2d 544, 547 (9th Cir. 1991). Under § 550(a)(2), a trustee may also recover from "any immediate or mediate transferee." Recovery under § 550(a)(2) is limited by § 550(b)(1). *Id.* Trustee may not recover from a mediate or immediate transferee where the requirements of § 550(b)(1) are satisfied by the

transferee.[1] "In general, section 550(b)(1) fully protects secondary transferees (and in turn their transferees) that have taken for value, in good faith, and without knowledge of the voidability of the transfer." 4 *Collier on Bankruptcy*, (15th Ed.) ¶ 550.-03[1], 550–5.

■ Defendants bear the burden of proof to determine the validity of their § 550(b)(1) defense. *Bonded Financial Services v. European American Bank*, 838 F.2d 890, 892 (7th Cir.1988).

At trial, I found that Defendants accepted the Funds in good faith and without notice of the avoidability of the transfers. The sole remaining issue, therefore, is whether value was given by Monaghan for the exchange.

Before turning to the issue of value, Trustee argues that any right that Monaghan had to purchase the Belanger shares terminated on April 1, 1987. Paragraph 10.01 of the Belanger Agreement provides that "upon dispatch of notice," Belanger has the right to terminate the contract unless certain conditions are met by the parties before April 1, 1987. Since some of these conditions were not met, Trustee argues that the Belanger Agreement terminated on April 1, 1987. However, at trial Monaghan testified that he never received "notice" of termination of the Belanger Agreement. Further, Trustee has failed to submit evidence substantiating any "notice" of termination. The "upon dispatch of notice" requirement was not met. Thus, for purposes of this proceeding, Monaghan had an enforceable option to purchase the Sterling stock.

■ Trustee argues that value under § 550(b)(1) is "fair market value." Defendants respond that § 550(b)(1) value is "reasonably equivalent value."

In *In re Agricultural Research and Technology Group*, 916 F.2d 528, 540 (9th Cir.1990), the trustee brought an action against an investment partnership of a corporate debtor under § 544(b). The court held that the transfers were avoidable. The trustee also sought recovery from the limited partners after the investment partnership distributed the avoidable funds to them. The limited partners asserted a § 550(b)(1) defense. The court concluded that under bankruptcy law, distributions to limited partners are classified as "equity security." Thus, the partnership distributions were not for value because the transfers were on "account of the partnership interests and not on account of debt or property *transferred* to the partnership...." *Id.* The court relied on the Uniform Fraudulent Transfer Act, comment 2, which states that value is to be determined in light of the Act's purpose to protect creditors. *Id.*

In *Matter of Still*, 963 F.2d 75 (5th Cir. 1992), the Fifth Circuit considered whether the Federal Deposit Insurance Corporation ("FDIC") could assert the § 550(b)(1) defense to an action under § 547. The FDIC had taken over a bank that had earlier obtained a judgment, and garnished the wages of the debtor. The trustee avoided the writs of garnishment under § 547. The FDIC asserted that it gave value under § 550(b)(1) by assuming the Bank's assets and liabilities under its statutory duties. The FDIC did not pay any cash or other property to the Bank when it succeeded to the Bank's assets as receiver. The court disagreed with the FDIC stating that, "[t]he Bankruptcy Code does not define 'value'." *Id.* at 76. The court held that:

Congress requires a subsequent transferee to "take for value" in order to merit protection under § 550(b). The FDIC would have us divorce the concept of value from the exchange of the Bank's assets. We do not think Congress intended the concept of "value" to be so attenuated. The FDIC does not "give

---

**1.** Code § 550(b) provides:

"The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided...."

value" to the Bank simply by performing its statutory duties.

*Id.* at 78.

Therefore, the court denied the FDIC's § 550(b)(1) defense for lack of value.

Although *Agricultural Research* and *Still* do not provide a clear definition of "value" for purposes of § 550(b)(1), they do require that the transferee transfer *something* of value that takes into consideration the interests of creditors.

In *Bonded Financial Services v. European Amer. Bank,* 838 F.2d 890 (7th Cir. 1988), the court discussed value under § 550(b)(1). A bank loaned Michael Ryan $655,000. The debtor, an affiliate of Ryan, remitted a $200,000 check to the bank's order with a note directing the bank to deposit the check into Ryan's account. Ten days later Ryan instructed the bank to debit $200,000 from his account in order to pay down the $655,000 loan. The court held that the $200,000 transfer from the debtor to Ryan was a fraudulent transfer under § 548(a). The trustee sought to recover the $200,000 from the bank under § 550(a). The trustee contended that under § 550(b)(1) a subsequent transferee must give value to the debtor and the bank only gave value to Ryan. However, the court rejected this view stating that when discussing value, "[a] natural reading looks to what the transferee gave up rather than what the debtor received." *Id.* at 897. The court held that the bank had given value in exchange for the $200,000 by reducing debtor's debt.

Trustee cites *In re Auxano, Inc.,* 96 B.R. 957 (Bankr.W.D.Mo.1989), for the proposition that value under § 550(b)(1) is "fair market value." In *Auxano,* the trustee filed an adversary action to set aside the transfer of real estate to ITT Financial ("ITT"). ITT claimed to have a § 550(b)(1) defense. *Auxano* is the only published case I found that clearly defines value under § 550(b)(1). The court stated that:

[u]nlike Section 549(c) or various other provisions in the Code, the concept of value in Section 550(b)(1) is not modified or circumscribed by such words as fair or equivalent ... in determining whether this is sufficient value to escape recovery by the estate, the Court must be forever mindful of the purpose of the avoidance and recovery powers—to preserve the assets of the estate.

*Id.* at 965.

The court in *Auxano* set forth a two-step approach to determine value. Citing *Bonded Financial,* the court looked at the value of the property transferred and then determined if fair market value was received.

*Auxano* relies on *Matter of Nevada Implement Co.,* 22 B.R. 105, 106 (Bankr. W.D.Mo.1982), and *In re Vann,* 26 B.R. 148 (Bankr.S.D.Ohio 1983), for its fair market value standard under § 550(b)(1). However, the *Nevada Implement* and *Vann* courts concluded that fair market value should be given for purposes of § 550(a), not § 550(b)(1). The two sections use value for different purposes. Section 550(a) seeks to recover property from a person who has wrongfully taken funds from an estate, while § 550(b)(1) is meant to protect an innocent third party transferee from liability on avoidable transfers.

Section 550(b)(1) provides a bona fide purchaser defense. I believe reference to bona fide purchaser provisions in state law is appropriate in deciding the standard of value to apply under § 550(b)(1). California Commercial Code ("Cal.Comm.Code") § 2–403(1) provides protection to bona fide purchasers for value who are transferees of fraudulently transferred goods. Value for purposes of § 2–403(1) is defined under Cal.Comm.Code § 1–201(44). Section 1–201(44) states that a person gives "value" for rights if he acquires them in exchange for any consideration sufficient to support a simple contract.[2] California Civil Code

---

**2.** Cal.Comm.Code § 1–201(44) defines "value" as

... [e]xcept as otherwise provided with respect to negotiable instruments and bank collections (Sections 3303, 4208 and 4209) a per-

son gives "value" for rights if he acquires them in any of the following ways:
(a) In return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn

("Cal.Civ.Code") § 1605, which defines good consideration, does not require property exchanged in a contract to equal fair market value.[3] A contract is supported by sufficient consideration if there is some benefit to the promisor or detriment to the promisee, regardless of the amount thereof. *Booth v. Bond,* 56 Cal.App.2d 153, 157, 132 P.2d 520 (1943). Thus, under the Cal. Comm.Code, to become a bona fide purchaser for value, one must give only "sufficient consideration."

Under the Uniform Fraudulent Transfer Act, Cal.Civ.Code § 3439.08 states that a transfer is not voidable as a fraudulent transfer against a person who takes in good faith and for a "reasonably equivalent value."[4]

Additionally, Collier disagrees with *Auxano*'s adoption of fair market value. Collier states that § 550(b)(1) does not require that the value given by the transferee be a fair equivalent. 4 *Collier on Bankruptcy,* (15th Ed.) ¶ 550.03[1] at 550–15.

Accordingly, I find that "reasonably equivalent value" and not "fair market value" is the proper standard for value under § 550(b)(1). This standard balances the interests of the creditors against those of innocent third parties, provides for the receipt of something more than that which is sufficient to support a contract, is consistent with state law on fraudulent transfers, and leaves the court with some latitude to apply a flexible rather than an exact standard to the facts and circumstances surrounding the transfers.

In *In re Morris Communications NC, Inc.,* 914 F.2d 458 (4th Cir.1990), the court considered what equals reasonable equivalence for purposes of § 548. The court rejected a mathematical formula for determining reasonable equivalence and stated that reasonable equivalence should depend on all the facts of each case, an important element of which is market value. *Id.* at 467. Although fair market value is not dispositive, it serves as a starting point of review. *Id.* Another important factor is whether the sale was "an arms's length transaction between a willing buyer and willing seller." *Id.*

In determining value, *Bonded Financial* instructs that the inquiry should be on what the transferee gave up in exchange for the transfers. *Bonded Financial,* 838 F.2d at 897. Anderson transferred to Monaghan the Funds in return for the right to purchase the option. This sum includes the $200,000 in earnest money, the modification fee of $10,000, the interest payment of $4,802.78 and the $93,018 down payment. What value did Monaghan give in return? Monaghan transferred no property to Anderson. *See Agricultural Research, supra* at 6. As a matter of fact, he failed to open the escrow that was the vehicle to consummate the transaction.[5] Additionally, he failed to execute and deliver into escrow the Release and Assignment Documents. Monaghan was required to do this by October 26, 1987. Therefore, despite receiving the

---

upon and whether or not a charge-back is provided for in the event of difficulties in collection.

    (b) As security for or in total or partial satisfaction of pre-existing claim.

    (c) By accepting delivery pursuant to a pre-existing contract for purchaser.

    (d) Generally, in return for any consideration sufficient to support a simple contract.
Cal.Comm.Code § 1–201(44) (West Supp.1993).

**3.** Cal.Civ.Code § 1605 states:

Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is good consideration for a promise.
Cal.Civ.Code § 1605 (West 1982).

**4.** Cal.Civ.Code § 3439.08(a) (West Supp.1993). The section provides:

    (a) A transfer of an obligation is not voidable under subdivision (a) of Section 3439.04, against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee....

**5.** Defendants argue that the Modified Sterling Agreement was modified a second time. Since I have no evidence of this second modification, I will not consider it for purposes of this proceeding.

Funds, Monaghan failed to perform his obligations under the Modified Sterling Agreement. Under the circumstances, Monaghan did not transfer reasonably equivalent · value to Anderson for the Funds.

■ Defendants believe that in my April 14, 1993 Memorandum Opinion I erroneously concluded that reasonably equivalent value was not given for the $200,000 earnest money. Defendants argue that since Anderson did not have any ability to perform a concurrent condition, as a matter of law Monaghan had no contractual obligation to establish the escrow or deposit any documentation into that escrow. I found in my April 14, 1993 Memorandum Opinion that Monaghan and Anderson had "conditions concurrent" under the Modified Sterling Agreement. Cal.Civ.Code § 1439 provides that there is no duty for one party to perform a condition concurrent until an offer of performance has been made by the other side.[6] I acknowledge that Monaghan had no duty to establish the escrow or deposit the transfer instruments into escrow until Anderson offered to and was able to perform his down payment obligations. The problem with Defendants' argument is that this is not an action for breach of contract. This is an action to determine whether a third party transferee took for reasonably equivalent value, in good faith and without knowledge of the voidability of the transfer. Accordingly, Cal.Civ.Code § 1439 is not dispositive on the outcome of this proceeding.

Defendants also contend that I should not have grouped the entire $200,000 earnest money to determine whether reasonably equivalent value was given in my April 14, 1993 Memorandum Opinion. Defendants believe that the two transfers of $100,000 in earnest money should be viewed independently for purposes of the § 550(b)(1). I agree. The two transfers occurred at different times and for different purposes.

The original transfer of $100,000 earnest money was made in connection with the purchase of the Option which had to be exercised by September 9, 1987. The second $100,000 earnest money was paid to Monaghan on September 23, 1987 in exchange for an extension of time to October 26, 1987 to close the transaction. Accordingly, the two payments were made at different times and for different purposes. It is, therefore, appropriate to view the payments independently in determining the § 550(b)(1) defense.

Earnest money is defined as "... a comparatively small down payment made as an assurance that the purchaser is in earnest and good faith and that if he fails to purchase the property the deposit will be forfeited.... [i]n effect earnest money operates as liquidated damages." *Bishop Ryan High School v. Lindberg*, 370 N.W.2d 726, 728 (1985).

■ Here, the contract states that in the event that the transaction does not close by October 26, 1987, the Sterling Agreement shall be mutually cancelled and Monaghan may retain any interest already paid on the down payment, or under the note, and may retain the entirety of the earnest money. When Monaghan signed the Sterling Agreement, he received $100,000 in earnest money. In return, he gave his commitment to carry out the terms of the Sterling Agreement. Moreover, Monaghan granted Anderson the exclusive right to purchase his interest in Sterling until September 9, 1987. The exclusive right to purchase an interest has value. Here, Monaghan's rights were valued at $2.5 million and the Sterling Agreement called for payment by Anderson of in excess of $1 million. The $100,000 earnest money represented approximately 10% of the Sterling Agreement purchase price. Accordingly, I believe that reasonably equivalent value was given by

---

**6.** Cal.Civ.Code § 1439 provides:

Performance, etc. of conditions when essential. Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party, except as provided by the next section.

Defendants in exchange for the initial $100,000 earnest money.

 I find, however, that reasonably equivalent value was not given in exchange for the September 23, 1987 earnest money deposit of $100,000. The payment extended the time for Anderson to pay the balance of the purchase price for October 26, 1987. The Modified Sterling Agreement allowed Anderson 34 additional days to close the transaction. In addition to the $100,000 earnest money, Anderson paid Monaghan a $10,000 modification fee. I do not believe that a 34 day extension is reasonably equivalent value for an additional $100,000 earnest money deposit. The $100,000 earnest money remitted on September 23, 1987 was not, therefore, reasonably equivalent value for purposes of § 550(b)(1).

In addition, I find that reasonably equivalent value was not given for $4,802.78 in interest on the down payment. The $4,802.78 was part of the Modified Sterling Agreement. The payment was remitted to Monaghan on September 23, 1987, representing interest on the down payment for July 9, 1987 to September 23, 1987.

 I find that Monaghan gave reasonably equivalent value for the $10,000 modification fee. Since Anderson had not deposited the down payment and note as of September 9, 1987, the Sterling Agreement was to terminate by its own terms. At that point Monaghan ideally could have kept the earnest money and refused to extend the date for Anderson to satisfy his conditions under the Sterling Agreement. Mutual promises to extend time of payment of a debt is good consideration. *Bank of America v. Hollywood Imp. Co.*, 46 Cal. App.2d 817, 821, 117 P.2d 13 (1941). The modification fee of $10,000 is reasonably equivalent value for the extension of time Monaghan gave Anderson to make the down payment. Thus, Monaghan may retain the $10,000 modification fee.

### CONCLUSION

The proper standard to determine value for purposes of § 550(b)(1) is reasonably equivalent value. Here, Monaghan did not give value for purposes of § 550(b)(1) for the $100,000 in earnest money transferred on September 23, 1987, the $93,018.00 down payment, and the $4,802.78 in interest. These transfers are avoidable under § 550(a)(2) and recoverable from Defendants. I find that Monaghan did give § 550(b)(1) value for the initial $100,000 earnest money and for the $10,000 modification fee.

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.