EASTERBROOK, Circuit Judge.
 

 Michael Ryan controlled a number of currency exchanges in Illinois. He also owned quite a few horses, doing business as Shamrock Hill Farm. Ryan had borrowed $655,000 from European American Bank to run this business. One of the currency exchanges, Bonded Financial Services, put $200,000 at Ryan’s disposal in January 1983. Bonded sent the Bank a check payable to the Bank’s order on January 21 with a note directing the Bank to “deposit this check into Mike[ Ryanj’s account.” The Bank did this. On January 31 Ryan instructed the Bank to debit the account $200,000 in order to reduce the outstanding balance of the Shamrock loan. The Bank did this. Ryan paid off the loan in two more installments, on February 11 and 14, 1983. The Bank released its security interest in the horses.
 

 The currency exchanges and Ryan paid visits to the judicial system. Bonded filed a petition in bankruptcy on February 10, 1983, along with about 65 other entities that Ryan controlled. Creditors later filed involuntary proceedings against Ryan. Ryan was convicted of mail fraud on account of his irregular administration of the currency exchanges (Bonded was not, for starters) and is in prison. The transfer of $200,000 out of Bonded on January 21, 1983, was a fraudulent conveyance, see 11 U.S.C. § 548(a), and the trustee may recover for the benefit of creditors the value of such a conveyance. The trustee seeks to recover from the Bank, which unlike Ryan is solvent.
 

 The right of recovery depends on 11 U.S.C. § 550:
 

 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 

 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 

 (2) any immediate or mediate transferee of such initial transferee.
 

 (b) The trustee may not recover under section (a)(2) of this section from—
 

 (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
 

 (2) any immediate or mediate good faith transferee of such transferee.
 

 Bonded’s trustee contends in this adversary proceeding that the Bank is the “initial transferee” under § 550(a)(1) because it was the payee of the check it received on January 21; that the Bank is in any event the “entity for whose benefit such transfer was made” because Ryan intended to pay off the loan when he caused Bonded to write the check; that if the Bank is a subsequent transferee under § 550(a)(2) it did not give “value” under § 550(b)(1) because Bonded received nothing; and that the Bank loses even if it gave value because it should have known that something was amiss, given the substantial sum Bonded was transferring to a corporate officer. The bankruptcy court granted summary judgment to the Bank without explicitly discussing § 550. The district court affirmed on appeal under 28 U.S.C. § 158(a). It held that the Bank handled the check of January 21 as a “mere conduit” and so was not the initial transferee; that Ryan was the person “for whose benefit the transfer was made" because he got the benefit of the reduction in the balance of the loan; that the Bank’s giving value to Ryan satis
 
 *892
 
 fied § 550(b)(1); and that because the trustee presented no evidence that the Bank knew or should have known of Bonded’s impending collapse, the Bank took in good faith. Our jurisdiction rests on 28 U.S.C. § 158(d). See
 
 In re Morse Electric Co.,
 
 805 F.2d 262 (7th Cir.1986);
 
 In re Cash Currency Exchange,
 
 762 F.2d 542 (7th Cir. 1985).
 

 I
 

 If the note accompanying Bonded’s check had said: “use-this check to reduce Ryan’s loan” instead of “deposit this check into [Ryan]’s account”, § 550(a)(1) would provide a ready answer. The Bank would be the “initial transferee” and Ryan would be the “entity for whose benefit [the] transfer was made”. The trustee could recover the $200,000 from the Bank, Ryan, or both, subject to the rule of § 550(c) that there may be but one recovery. The trustee contends that the apparently formal difference — depositing the check in Ryan’s account and then debiting that account— should not affect the outcome. In either case the Bank is the payee of the check and ends up with the money, while Ryan gets the horses free of liens and Bonded is left holding the bag. From a larger perspective, however, the two cases are different.
 

 Fraudulent conveyance law protects creditors from last-minute diminutions of the pool of assets in which they have interests. They accordingly need not monitor debtors so closely, and the savings in monitoring costs make businesses more productive. See Douglas G. Baird & Thomas H. Jackson,
 
 Fraudulent Conveyance Law and its Proper Domain,
 
 38 Vand.L.Rev. 829 (1985); Robert Charles Clark,
 
 The Duties of the Corporate Debtor to its Creditors,
 
 90 Harv.L.Rev. 505, 554-60 (1977). The original rule, in 13 Eliz. ch. 5 (1571), dealt with debtors who transferred property to their relatives, while the debtors themselves sought sanctuary from creditors. The family enjoyed the value of the assets, which the debtor might reclaim if the creditors stopped pursuing him. In the last 400 years the principle has been generalized to address transfers without either sufficient consideration or bad intent, for they, no less than gifts, reduce the value of the debtor’s estate and thus the net return to creditors as a group.
 
 [1]
 
 The trustee reverses, for the benefit of all creditors, un- or under-compensated conveyances within a specified period before the bankruptcy.
 

 There have always been limits on the pursuit of transfers. If the recipient of a fraudulent conveyance uses the money to buy a Rolls Royce, the auto dealer need not return the money to the bankrupt even if the trustee can identify the serial numbers on the bills. The misfortune of the firm’s creditors is not a good reason to mulct the dealer, who gave value for the money and was in no position to monitor the debtor. Some monitoring is both inevitable and desirable, and the creditors are in a better position to carry out this task than are auto dealers and the many others with whom the firm’s transferees may deal. The considerations behind the holder in due course rule for commercial paper, Uniform Commercial Code § 3-302, and the bona fide purchaser rule for chattels, UCC § 2-403(1) — the waste that would be created if people either had to inquire how their transferors obtained their property or to accept a risk that a commercial deal would be reversed for no reason they could perceive at the time — also apply to subsequent holders of assets fraudulently conveyed out of bankrupts. Just as the holder in due course rule requires the transferor of commercial paper to bear the risk and burden of inquiry, increasing the liquidity of paper, so § 550(b) leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent. The initial transferee is the best monitor; subsequent transferees usually do not know
 
 *893
 
 where the assets came from and would be ineffectual monitors if they did.
 

 The potential costs of monitoring and residual risk are evident when the transferees include banks and other financial intermediaries. The check-clearing system processes more than 100 million instruments every day; most pass through several banks as part of the collection process; each bank may be an owner of the instrument or agent for purposes of collecting at a given moment. Some of these instruments represent funds fraudulently conveyed out of bankrupts, yet the cost of checking back on the earlier transferors would be staggering. Bonded’s trustee dismisses financial intermediaries on the ground that they obviously are not initial transferees, but this is not so clear. Hundreds of thousands of wire transfers occur every day. The sender of money on a wire transfer tells its bank to send instructions to the Federal Reserve System (for a Fed-wire transfer) or to a correspondent bank to make money or credit available through still another bank. The Fed or the receiving bank could be called the “initial transferee” of the funds if we disregarded the function of fraudulent conveyance law. Similarly, an armored car company might be called the “initial transferee” if the bankrupt gave it valuables or specie to carry. Exposing financial intermediaries and couriers to the risk of disgorging a “fraudulent conveyance” in such circumstances would lead them to take precautions, the costs of which would fall on solvent customers without significantly increasing the protection of creditors.
 

 The functions of fraudulent conveyance law lead us to conclude that the Bank was not the “initial transferee” of Bonded’s check even though it was the payee. The Bank acted as a financial intermediary. It received no benefit. Ryan’s loan was fully secured and not in arrears, so the Bank did not even acquire a valuable right to offset its loan against the funds in Ryan’s account. Under the law of contracts, the Bank had to follow the instructions that came with the check. The Uniform Commercial Code treats such instructions as binding to the extent any contract binds (see UCC § 3-119).
 
 [2]
 
 The Bank therefore was no different from a courier or an intermediary on a wire transfer; it held the check only for the purpose of fulfilling an instruction to make the funds available to someone else.
 

 Although the Bankruptcy Code does not define “transferee”, and there is no legislative history on the point, we think the minimum requirement of status as a “transferee” is dominion over the money or other asset, the right to put the money to one’s own purposes. When A gives a check to B as agent for C, then C is the “initial transferee”; the agent may be disregarded. This perspective had impressive support under the 1898 Code, e.g.,
 
 Mayo v. Pioneer Bank & Trust Co.,
 
 270 F.2d 823, 830 (5th Cir.1959) (disregarding corporate forms in order to identify the entity with control over the assets), and has been employed under the 1978 Code as well, e.g.,
 
 In re Colombian Coffee Co.,
 
 75 B.R. 177, 178-79 (S.D.Fla.1987), affirming 64 B.R. 585 (Bkr.S.D.Fla.1986). See also
 
 In re Auto-Pak, Inc.,
 
 73 B.R. 52 (D.D.C.1987) (treating the IRS as a mediate rather than initial transferee when the money is washed through a second corporation’s account);
 
 In re Jorges Carpet Mills, Inc.,
 
 50 B.R. 84 (Bkr.E.D.Tenn.1985) (similar). Cf. Comment,
 
 Guarantees and Section 548(a)(2) of the Bankruptcy Code,
 
 52 U.Chi.L.Rev. 194 (1985) (advocating rechar-acterization of three-cornered transactions to find the real beneficiaries).
 

 As the Bank saw the transaction on January 21, it was Ryan’s agent for the purpose of collecting a check from Bonded’s bank. Cf. UCC § 4-201(1) (giving a collecting bank a presumption of agency status unless “a contrary intent clearly appears”). It received nothing from Bonded that it could call its own; the Bank was not Bonded’s creditor, and Ryan owed the Bank as
 
 *894
 
 much as ever. The Bank had no dominion over the $200,000 until January 31, when Ryan instructed the Bank to debit the account to reduce the loan; in the interim, so far as the Bank was concerned, Ryan was free to invest the whole $200,000 in lottery tickets or uranium stocks. As the Bank saw things on January 31, it was getting Ryan’s money. It would be at risk if Ryan were defrauding his other creditors or preferring the Bank, but the Bank would perceive no reason to investigate Bonded or sequester the money for the benefit of Bonded’s creditors. So the two-step transaction is indeed different from the one-step transaction we hypothesized at the beginning of this discussion.
 

 We are aware that some courts say that an agent (or a bank in a case like ours) is an “initial transferee” but that courts may excuse the transferee from repaying using equitable powers. See, e.g.,
 
 Colombian Coffee Co.,
 
 75 B.R. at 179-80 (alternative holding);
 
 In re C-L Cartage Co.,
 
 70 B.R. 928 (Bkr.E.D.Tenn.1987). This is misleading. “Transferee” is not a self-defining term; it must mean something different from “possessor” or “holder” or “agent”. To treat “transferee” as “anyone who touches the money” and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam’s Razor and leave a more functional rule.
 

 There is a related, and more nettlesome, question about the use of equitable powers under § 550(a). Genuine transferees can be caught in a time warp as a result of the special treatment of inside guarantors. Suppose Firm borrows money from Lender, with Guarantor as surety. When Firm pays off the debt, Lender is the “initial transferee” and Guarantor is an “entity for whose benefit [the] transfer was made”. The payment of a debt benefits the guarantor.
 
 Paper v. Stern,
 
 198 F. 642 (8th Cir. 1912). Each may have received a preference voidable under § 547 (and therefore recoverable under § 550). If Guarantor is a stranger to Firm, the trustee may recover only preferences within 90 days of the petition. 11 U.S.C. § 547(b)(4)(A). If Guarantor is an “insider” at the time of the transfer, the preference period lasts a year. 11 U.S.C. § 547(b)(4)(B). Section 547(b)(4) distinguishes according to the status of Guarantor, but § 550 does not. It says that if a transfer is recoverable by the trustee, it may be recovered from
 
 either
 
 the “initial transferee” (Lender) or the “entity for whose benefit such transfer was made” (Guarantor). This creates a situation that several courts have perceived to be “inequitable”: Lender must satisfy the trustee (if Firm goes bankrupt between 91 days and a year after the preference) when Guarantor is an insider, but not when Guarantor is a stranger, yet, it seems, this has nothing to do with any proper theory of Lender’s liability. Most bankruptcy courts that have addressed this question conclude that “equity” will relieve Lender from a literal construction of § 550. Commentators, whose articles collect and discuss the cases, are divided. Compare Lawrence P. King, 4
 
 Collier on Bankruptcy
 
 11550.02 at p. 550-8 (15th ed. 1987), and Yern Countryman,
 
 The Trustee’s Recovery in Preference Actions,
 
 3 Bankruptcy Developments J. 449, 464 (1986) (equity may relieve Lender from the application of § 550), with Isaac Nutovic,
 
 The Bankruptcy Preference Laws: Interpreting Code Sections 54.7(c)(2), 550(a)(1), and 546(a)(1),
 
 41 Bus.Law. 175, 186-99 (1985), and Thomas E. Pitts, Jr.,
 
 Insider Guaranties And The Law of Preferences,
 
 55 Am.Bkr.L.J. 343 (1981) (Lender should be liable in these circumstances), with Phillip J. Blumberg,
 
 The Law of Corporate Groups: Problems in Bankruptcy
 
 § 9.03 (1985) (liability should turn on Guarantor’s solvency). We have serious doubts both about the amount of equity in Lender’s position (for Firm may have paid Lender preferentially only to assist Guarantor, the insider, and Lender is in a good position to monitor the performance of its debtor; if Firm collects from Lender, Lender may collect in turn from Guarantor, bearing the risk of Firm’s insolvency it planned to bear all along) and about the propriety of judges’ declining to enforce statutes that produce inequitable results. Bankruptcy statutes are not special cases. See
 
 Boston & Maine Corp. v.
 
 
 *895
 

 Chicago Pacific Corp.,
 
 785 F.2d 562, 566 (7th Cir.1986);
 
 In re Chicago, Milwaukee, St. Paul & Pacific R.R.,
 
 791 F.2d 524, 528 (7th Cir.1986). See also, e.g.,
 
 Official Committee v. Mabey,
 
 832 F.2d 299, 302 (4th Cir.1987);
 
 Guerin v. Weil, Gotshal & Manges,
 
 205 F.2d 302, 304 (2d Cir.1953) (A. Hand, J.). We mention the problem not to resolve it (for it is not before us) but to show that this appeal to “equity” — to deny recovery against an “initial transferee” within the statute — is different in source and scope from the way in which we have employed considerations of policy to
 
 define
 
 “transferee” under § 550(a)(1). Doubts about this use of equity do not imply that courts should take “transferee” for all it could be worth rather than for what a sensible policy implies it is worth.
 

 II
 

 If the Bank is not the “initial transferee”, the trustee insists, it is at least the “entity for whose benefit such transfer was made”. The Bank ultimately was paid and therefore, one might think, it got the “benefit” of the transfer — though the Bank cancelled the note and gave up a security interest in horses that, the trustee concedes, was sufficient to cover the balance. Kenneth Kortas, Bonded’s day-to-day manager, filed an affidavit stating that he prepared the check in question at Ryan’s request as part of Ryan’s program “to put the horse business in a position where it could function and sustain itself for at least several months even if his other business ventures ran into financial difficulty.... At the request of Ryan, I routinely prepared checks payable to banks where Ryan had personal accounts and loan accounts to finance his horse business.” This may show that Ryan intended all along to wash the $200,000 through his personal account and pay the Bank; at a minimum, the argument would run, questions of intent prevent summary judgment.
 

 The Bank responds that
 
 it
 
 did not “intend” to be the beneficiary of the transfer; it was not in cahoots with Ryan or Bonded and did not know of their plans. Moreover, the Bank insists that it did not receive a “benefit” because it gave value for the $200,000. The only beneficiary on this view was Ryan, who increased his equity position in Shamrock Hill Farm and obtained clear title to the horses. As both initial transferee and ultimate beneficiary, Ryan is the only person covered by § 550(a)(1), the Bank insists. The distinction is important, because entities covered by § 550(a)(1) cannot use the value-and-good-faith defense provided by § 550(b).
 

 This exchange seems to raise difficult questions. To what extent does “intent” matter under § 550(a)(1)? If intent matters, whose? To what extent must courts find the true economic benefits of a transaction? If the Bank were undersecured, would the transfer make the Bank the beneficiary by the amount of the difference between the loan and the security? Suppose Ryan planned to, and did, buy a Rolls Royce with the money; would the dealer be the beneficiary by the difference between the wholesale and retail price of the car? How are bankruptcy courts to determine “intent” and compute the benefit in transactions of this nature?
 

 These questions need not be answered, because a subsequent transferee cannot be the “entity for whose benefit” the initial transfer was made. The structure of the statute separates initial transferees and beneficiaries, on the one hand, from “immediate or mediate transferee[s]”, on the other. The implication is that the “entity for whose benefit” is different from a transferee, “immediate” or otherwise. The paradigm “entity for whose benefit such transfer was made” is a guarantor or debtor— someone who receives the benefit but not the money. In the Firm-Guarantor-Lender example at the end of Part I, when Firm pays the loan, Lender is the initial transferee and Guarantor, which no longer is exposed to liability, is the “entity for whose benefit”. If Bonded had sent a check to the Bank with instructions to reduce Ryan’s loan, the Bank would have been the initial transferee and Ryan the “entity for whose benefit”. See
 
 In re Universal Clearing House Co.,
 
 62 B.R. 118, 128-29 (D.Utah 1986);
 
 In re Day Telecommunications, Inc.,
 
 70 B.R. 904, 909 (Bkr. E.D.N.
 
 *896
 
 C.1987); Daniel R. Cowans, 2
 
 Bankruptcy Law and Practice
 
 § 10.11 (1986). Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated. If B gave value to the bankrupt for the benefit, B will receive credit in the bankruptcy, see 11 U.S.C. § 547(c)(1)(A), § 548(c), and if not, B should be subject to recovery to the same extent as A — sometimes ahead of A, although § 550 does not make this distinction. Someone who receives the money later on is not an “entity for whose benefit such transfer was made”; only a person who receives a benefit from the initial transfer is within this language.
 
 [3]
 

 The legislative history of § 550(a) might show that a transferee also could be an “entity for whose benefit” — but it does not. There is no legislative history concerning the “entity for whose benefit” language and little legislative history for the rest of § 550. The section was extensively revised after the bill had been reported by the committees in both houses of Congress. Senator DiConcini and Representative Edwards read into the Congressional Record identical statements about the effect of the amendment, 124 Cong.Rec. 32400 (1978) (Edwards), 124 Cong.Rec. 34000 (DiConci-ni):
 

 Section 550(a)(1) of the House amendment has been modified in order to permit recovery from an entity for whose benefit an avoided transfer is made in addition to a recovery from the initial transferee of the transfer. Section 550(c) would still apply, and the trustee is entitled only to a single satisfaction. The liability of a transferee under section 550(a) applies only “to the extent that a transfer is avoided”. This means that, liability is not imposed on a transferee to the extent that a transferee is protected under a provision such as section 548(c) which grants a good faith transferee for value of a transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given.
 

 This is the only discussion of the enacted version of § 550(a) in the legislative history of the 1978 Code, and it does not address the problems our case presents. We are left with the inference from structure: § 550 distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property.
 

 To say that the categories “transferee” and “entity for whose benefit such transfer was made” are mutually exclusive does not necessarily make it easy to determine in which category a given entity falls. The method we employed in Part I of this opinion to decide that the Bank was not an “initial” transferee governs the question whether entities are subsequent transferees, too. The answer is not difficult in this case, however. The Bank did not obtain a benefit from the transfer to Ryan on January 21; it obtained dominion over the funds on January 31. The Bank is a transferee.
 

 Ill
 

 A trustee may not recover from a subsequent transferee who “takes for value, including satisfaction ... of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided”, § 550(b)(1). The Bank took for value on January 31. It had extended $655,000 in credit to Ryan, and the payment satisfied $200,000 of this debt; the Bank also released a share of its security interest. Bonded’s trustee contends, however, that a subsequent transferee
 
 *897
 
 must give value to the debtor; the Bank gave value only to Ryan.
 

 The statute does not say “value to the debtor”; it says “value”. A natural reading looks to what the transferee gave up rather than what the debtor received. Other portions of the Code require value to the debtor. Section 548(c), for example, gives the initial recipient of a fraudulent conveyance a lien against any assets it hands back, “to the extent that such transferee ... gave value to the debtor in exchange for such transfer”. The difference between “value” in § 550(b)(1) and “value to the debtor” in § 548(c) makes sense. Section 550(b)(1) implements a system well known in commercial law, in which a transferee of commercial paper or chattels acquires an interest to the extent he purchased the items without knowledge of a defect in the chain. These recipients receive protection because monitoring of earlier stages is impractical, and exposing them to risk on account of earlier delicts would make commerce harder to conduct. Benefits to the commercial economy, and not to the initial transferors (who may be victims of fraud), justify this approach.
 

 Transferees and other purchasers generally deal only with the previous person in line; they give value, if at all, to their transferors (or the transferors’ designees). The statute emulates the pattern of other rules protecting good faith purchasers. All of the courts that, have considered this question have held or implied that value to the transferor is sufficient. E.g.,
 
 Smith v. Mixon,
 
 788 F.2d 229 (4th Cir.1986) (implication);
 
 In re Universal Clearing House,
 
 62 B.R. at 124-26;
 
 In re Auto-Pak,
 
 73 B.R. at 54;
 
 In re Chase & Sanborn Corp.,
 
 51 B.R. 739 (Bkr.S.D.Fla.1985). We agree with these cases. The trustee cites two cases—
 
 In re B-F Building Corp.,
 
 312 F.2d 691 (6th Cir.1963), and
 
 Edward Hines Western Pine Co. v. First National Bank of Chicago,
 
 61 F.2d 503 (7th Cir.1932)—for the proposition that value “must run to the debtor and not to third parties” (Br. 24), but the citations are fanciful. Neither case construes § 550; in each case the transferee was the initial rather than subsequent taker; in each case the court con-eluded that there had been no consideration running to anyone. Such cases do not address the problem we have just resolved.
 

 IV
 

 The final question is whether the Bank received the $200,000 “in good faith, and without knowledge of the voidability of the transfer avoided”. The trustee does not contend that the Bank knew of Bonded’s precarious condition or Ryan’s plan to use Bonded’s money to pay his personal debts. He does not say that the Bank acted in bad faith—or even that there is a difference between “good faith” and “without knowledge of the voidability of the transfer”. See 4
 
 Collier on Bankruptcy
 
 ¶ 550.03[1] p. 550-10 (treating the two as redundant); Countryman, 3 Bankruptcy Developments J. at 475-80. (We need not decide whether there is a difference.) And the trustee does not try to show that this transaction satisfies the test suggested by the legislative history of § 550(b)(1):
 

 The phrase “good faith” in [§ 550(b) ] is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a transfer from him, that is, “washing” the transaction through an innocent third party. In order for the transferee to be excepted from liability ... he himself must be a good faith transferee.
 

 H.R.Rep. No. 95-595, 95th Cong., 2d Sess. 376 (1978); S.Rep. No. 95-989, 95th Cong., 2d Sess. 90 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5876, 6332. The trustee contends, instead, that the Bank should have known about Bonded’s distress and Ryan’s chicanery; had it investigated the deposit on January 21, it would have found out; and because it should have known, this is as good as knowledge.
 

 Imputed knowledge is an old idea, employed even in the criminal law. See
 
 United States v. Ramsey,
 
 785 F.2d 184, 189-90 (7th Cir.1986). Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a rea
 
 *898
 
 sonable person to investigate. See
 
 Dokken v. Page,
 
 147 F. 438 (8th Cir.1906) (knowledge that the debtor is transferring almost all of its assets); Garrard Glenn,
 
 Fraudulent Conveyances
 
 § 295 (1931). No one supposes that “knowledge of voidability” means complete understanding of the facts and receipt of a lawyer’s opinion that such a transfer is voidable; some lesser knowledge will do.
 
 In re Nevada Implement Co.,
 
 22 B.R. 105 (Bkr.W.D.Mo.1982); Countryman, 3 Bankruptcy Developments J. at 476-77. Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge. See
 
 Bosco v. Serhant,
 
 836 F.2d 271, 276-78 (7th Cir.1987). But this is not the same as a duty to investigate, to be a monitor for creditors’ benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain. “Knowledge” is a stronger term than “notice”, see
 
 Smith v. Mixon,
 
 788 F.2d at 232. A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.
 

 Nothing in the record of this case suggests that the Bank knew of Bonded’s financial peril or Ryan’s plan. Bonded was not the Bank’s customer. The transfer from Ryan to the Bank on January 31 was innocuous. The Bank thought it got Ryan’s money; its loan was fully secured; it perceived Ryan as a well-heeled horse breeder, with a balance sheet in the millions, current on his loan payments.
 

 The transfer from Bonded to Ryan on January 21 was only slightly more problematic from the Bank’s perspective. A corporation was transferring $200,000 to one of its executives. This does not hint at a fraudulent conveyance by a firm on the brink of insolvency; for all the Bank knew, Bonded had plenty more where the $200,-000 came from. Banks frequently receive large checks from corporations to their officers; think of the annual bonus checks General Motors issues, or the check to repurchase a bloc of shares. A $200,000 check is not a plausible bonus for a currency exchange, however. It could hint at embezzlement. Several Illinois cases say that a bank should inquire when a firm’s employee signs a large check with himself as payee. See
 
 People ex rel. Nelson v. Peoples Loan & Trust Co.,
 
 285 Ill.App. 552, 2 N.E.2d 763 (1st Dist.1936);
 
 Milano v. Sheridan Trust & Savings Bank,
 
 242 Ill.App. 362 (1st Dist.1926).
 

 Since those cases were decided, Illinois adopted the Uniform Fiduciaries Act, which relieves banks of such a duty to inquire into the authority of the fiduciary signing the cheek on the maker’s behalf. Ill.Rev. Stat. ch. 17 ¶ 2009;
 
 Johnson v. Citizens National Bank of Decatur,
 
 30 Ill.App.3d 1066, 334 N.E.2d 295 (4th Dist.1975). At all events, the Bank had no reason to think Ryan an embezzler. The check was accompanied by a memorandum from Kenneth Kortas, Bonded’s manager, demonstrating that Ryan was not keeping other corporate officers in the dark. The Kortas memorandum would have led a reasonable bank to conclude that Bonded as a corporate entity wanted to make the transfer — and a bank drawing that inference here would have been right. Had the Bank called Kortas (or anyone else at Bonded) to inquire about the check, the Bank would have learned that the instrument was authorized by the appropriate corporate officials. Since the inquiry would have turned up nothing pertinent to voidability, the Bank’s failure to make it does not permit a court to attribute to it the necessary knowledge.
 

 The Bank is a subsequent transferee covered by § 550(b)(1). It took for value and without knowledge of the voidability of the initial transaction.
 

 Affirmed.
 

 [1]
 

 . The fraudulent conveyance must be distinguished from a preferential transfer to a creditor, which does not diminish the total payoff for the group, but which may be undone to reduce the incentive individual creditors have to rush to dismember the debtor before rival creditors can do so. The collective bankruptcy proceeding solves the common pool problem, which otherwise may produce a reduction in the value of the productive assets taken jointly.
 

 [2]
 

 . The instructions do not “affect the negotiability of an instrument”, § 3-119(2), so that a subsequent purchaser could be a holder in due course even if the Bank had disregarded the instructions, but this qualification is unimportant here.
 

 [3]
 

 . One who conspires with the debtor to make a fraudulent transfer, but has the transfer washed through an innocent party before reaching him, does not thereby escape. The conspirator will be a subsequent transferee under § 550(a)(2), but subsequent transferees who lack “good faith” must stand and deliver. Section 550(b)(1); see also Countryman, 3 Bankruptcy Developments J. at 453-54, 459-63 (collecting cases distinguishing conspirators who do not receive any part of the transfer from those who do.)