In re IMAGESET, INC., Debtor.

John C. Turner, Trustee, Plaintiff,

v.

Phoenix Financial, LLC, Edward O. Darling, Sr., Mary Ellen Darling, Mary Kathleen Fraser, Susan E. Darling, and Mary F.D. Kelly, Defendants.

Bankruptcy No. 00–21197.
Adversary No. 02–2068.

United States Bankruptcy Court,
D. Maine.

Sept. 26, 2003.

Jonathan Doolittle, Esq., Andrew Sarapas, Esq., Verrill & Dana, Portland ME, for Plaintiff.

Stephen G. Morrell, Esq., Eaton, Peabody, Brunswick, ME, for Defendant.

### Memorandum of Decision

JAMES B. HAINES, JR., Chief Judge.

Before me is the plaintiff's motion for partial summary judgment and the defendants' cross motion for summary judgment, each addressing the fourteenth count of the plaintiff's fifteen-count complaint. For the reasons set forth below, the plaintiff's motion will be granted to a very limited extent and otherwise denied. Defendants' cross motion will be denied.[1]

### Facts [2]

On the basis of an unopposed involuntary petition, an order for relief placed Imageset, Inc., in Chapter 7 bankruptcy on August 25, 2000. John Turner, plaintiff here, was appointed trustee. Turner commenced this adversary proceeding with the filing of a fifteen-count complaint naming multiple defendants. He has since settled disputes with all defendants except Phoenix Financial, LLC; Edward Darling, Sr.; Mary Ellen Darling; Mary Kathleen Fraser; Susan E. Darling; and Mary Kelly; against whom he continues to seek recovery of approximately $238,000 on fraudulent transfer and preference theories.

Phoenix Financial, LLC ("Phoenix") is a Maine limited liability company, organized on December 30, 1997. Phoenix was formed for the dual purposes of (i) acquiring Imageset's loan obligations to a commercial bank, and (ii) providing Imageset with additional financing. The five remaining individual defendants each hold twenty per cent capital contribution units in Phoenix.

In addition to being a member of Phoenix, each of the individual defendants also holds stock in Imageset. Each acquired his or her Imageset stock on or about December 31, 1997.[3] Phoenix played an intermediary role in the acquisitions. Each defendant deposited personal funds sufficient to cover his or her respective stock purchase into a Phoenix account. Phoenix then tendered the funds to Imageset, which issued stock to the individuals.

Edward Darling, Jr., who is no longer a defendant in this action,[4] was at all relevant times an officer and a director of Imageset. He is the son of Edward Darling, Sr. and Mary Ellen Darling and the brother of Mary Kathleen Fraser, Susan Darling, and Mary Kelly.

---

1. This memorandum sets forth the court's conclusions of law in accordance with Fed. R. Bankr.P. 7056. Unless otherwise indicated, references to statutory sections or to the "Bankruptcy Code" or "Code" refer to the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101, et seq., as amended.

2. As part of their competing motions for summary judgment, and in compliance with local summary judgment practice, each party has filed a statement of material facts supporting its position and opposing its opponent's. Unless otherwise noted, only agreed facts are recited below.

3. Specifically, their stock interests were as follows:

| | |
|---|---|
| Edward Darling, Sr. | 1,157.94 shares |
| Mary Ellen Darling | 210.77 shares |
| Mary Kathleen Fraser | 210.77 shares |
| Mary Kelly | 210.77 shares |
| Susan Darling | 210.77 shares |

Turner alleges their collective ownership interest in Imageset equals 24%. The defendants concede only that it (collectively) exceeds 20%.

4. See Order dated 8/20/2003, doc. # 61 (Order Granting Application to Compromise).

Phoenix lent Imageset approximately $203,750.00 in the last days of 1997. Imageset, in turn, gave Phoenix promissory notes in the amounts of $173,750.00 and $30,000.00. The loans were secured by, *inter alia,* first liens on the debtor's accounts and inventory.[5] Between January 1999 and January 2000, in a series of payments, Imageset paid Phoenix $138,739.40 interest and principal on the $173,750.00 note, and paid the $30,000 note in full (one payment of $32,705.89 in December 1999). In April 2000, Key Bank, one of Imageset's principal secured lenders, paid Phoenix the remaining balance on the $173,750.00 note in return for an assignment of its remaining claims and security.

### Discussion

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Rosenberg v. City of Everett,* 328 F.3d 12, 17 (1st Cir.2003).

The role of summary judgment is to look behind the facade erected by the pleadings and assay the parties' proof in order to determine whether a trial will serve any useful purpose. Conventional summary judgment practice requires the moving party to assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality. Once the movant has done its part, the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists....

In conducting this tamisage, the ... court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor. This standard is notoriously liberal-but its liberality does not relieve the nonmovant of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe. Moreover, the factual conflicts relied upon by the nonmovant must be both genuine and material. For this purpose, "genuine" means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and "material" means that the fact is one that might affect the outcome of the suit under the applicable law.

*Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir.2003) (citations omitted).

### The Maine UFTA

In addition to traditional fraudulent transfer avoidance and recovery, the Maine UFTA provides what is, essentially, an "insider preference" avoidance and recovery provision.

**Transfer to insider.** A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

14 M.R.S.A. § 3576(2). Such transfers are " avoidable," 14 M.R.S.A. § 3578(1)(A), for up to six years after the transfer "occurred," 14 M.R.S.A. § 3577. *See* 14 M.R.S.A. § 752 (six year statute of limitations for civil actions).

Insofar as corporate debtors are concerned, "insider" is defined as follows:

**Insider.** "Insider" includes

\* \* \*

---

**5.** Imageset's secured lenders voluntarily subordinated their liens.

**B.** If the debtor is a corporation:

(1) A director of the debtor;

(2) An officer of the debtor;

(3) A person in control of the debtor;

(4) A partnership in which the debtor is a general partner;

(5) A general partner in a partnership described in subparagraph (4); or

(6) A relative of a general partner, director, officer or person in control of the debtor;

14 M.R.S.A. § 3572(7).[6] The statute defines "relative" in specific terms to include individuals related within the "3rd degree of consanguinity," including those related by marriage and adoption. 14 M.R.S.A. § 3572(11) (" 'Relative' means an individual related by consanguinity within the 3rd degree as determined by the common law, a spouse or an individual related to a spouse within the 3rd degree so determined, and includes an individual in an adoptive relationship within the 3rd degree."). In addition to entities identified in the statute's corporation-specific subsection, a debtor's "affiliate" and "an insider of an affiliate as if the affiliate were the debtor" are "insiders" as to any brand of debtor. 14 M.R.S.A. § 3572(7)(D). "Affiliate" is defined in the following terms:

**Affiliate.** "Affiliate" means:

**A.** A person who directly or indirectly owns, controls or holds with power to vote, 20% or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

(1) As a fiduciary or agent without sole discretionary power to vote the securities; or

(2) Solely to secure a debt, if the person has not exercised the power to vote;

**B.** A corporation 20% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote, by the debtor, or a person who directly or indirectly owns, controls or holds with power to vote 20% or more of the outstanding voting securities of the debtor, other than a person who holds the securities:

(1) As a fiduciary or agent without sole power to vote the securities; or

(2) Solely to secure a debt, if the person has not exercised the power to vote;

**C.** A person whose business is operated by the debtor under a lease or other agreement, or a person substantially all of whose assets are controlled by the debtor; or

**D.** A person who operates the debtor's business under a lease or other agreement or controls substantially all of the debtor's assets.

14 M.R.S.A. § 3572(1).

The Maine UFTA definition of "insider" is derived from the definition in Bankruptcy Code § 101(31), with minor variations. Although the definition is extensive, it is not exhaustive. The drafters purposely preceded the listed categories of insider entities with the word "includes" to make clear that the statutory definition is not exclusive. 14 M.R.S.A. § 4572 cmt. (7); *see also Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1010 (5th Cir.1992) (Texas UFTA).

---

**6.** Noone disputes that Imageset is a "debtor" within the statute's meaning. *See* 14 M.R.S.A. § 3572(6) ("debtor" means a "person who is liable on a claim"); 14 M.R.S.A. § 3572(9) ("person" means "individual, part-nership, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust or any other legal or commercial entity").

**714**

### What the Plaintiff Seeks

Turner's motion addresses Count XIV, but it seeks merely to limit triable issues under that count, rather than to resolve it completely.[7] Specifically, he asks that I determine:

> 1) that there exists a creditor of Imageset under circumstances that provide Turner standing to pursue this fraudulent transfer avoidance action under Maine law and the Bankruptcy Code;
>
> 2) that by virtue of their Imageset stock ownership and relation to Phoenix, the individual defendants and Phoenix are insiders of Imageset;
>
> 3) that Imageset made a series of payments totaling $171,257.59 to Phoenix and Edward Darling, Sr., between January 1, 1999, and December 31, 1999, and an additional payment of $56,269.58 to Phoenix and Edward Darling, Sr. on April 12, 2000;[8]
>
> 4) that the payments to Phoenix and Edward Darling, Sr., were "for the benefit" of each and all the individual defendants; and
>
> 5) that Phoenix and Edward O. Darling, Sr., are "initial transferees" of the Imageset payments within the meaning of § 550(a)(1).

Defendants attack Turner's theory on several fronts. First, they argue that Turner has failed to carry his burden of proving that any unsecured creditor held a claim against Imageset on the dates the transfers were made, a required element for recovery under the Maine UFTA. They also insist that Phoenix is *not* an insider of the debtor because Phoenix owned no Imageset stock and held no position of control

over it. Therefore, because all of the debt at issue was owed to Phoenix (not to any of the *individual* defendants), and because all the transfers at issue were paid to Phoenix and deposited into a Phoenix account, the payments are not recoverable. The individual defendants assert there can be no recovery against them as those "for whose benefit [the transfers were] made," 11 U.S.C. § 550(a)(1), because money was neither owed or paid them. To hold them liable here would be to pierce Phoenix's veil without justification.

In order to get home, Turner's claim must touch each of the following bases: Bankruptcy Code § 544(b)(1) ("the trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title ..."); the Maine UFTA, 14 M.R.S.A. § 3576(2) (insider preference provision quoted above, providing the "applicable law" for § 554(b)(1)'s purposes); and, finally, Bankruptcy Code § 550(a)(1) (providing that, to the extent that a transfer is avoided under § 544, the trustee may recover the transferred property or its value from the initial transferee or "the entity for whose benefit such transfer was made").

There is no dispute that the transactions under scrutiny took place and (with the exception of the Key Bank payment) were transfers of Imageset's property or that Imageset's obligations to Phoenix preexisted the transfers, constituting "antecedent debt." Thus, for today, the critical issues are (1) the existence of a creditor who would have standing under the Maine

---

**7.** Turner reserves issues anent Imageset's solvency and defendants' knowledge or constructive knowledge regarding Imageset's insolvency at the time the payments were made.

**8.** The record is not entirely clear on the amount of the April 2000 payment to Phoenix from Key Bank. It is alternatively referred to by both parties as $56,269.58 and $54,737.06. The amount of the transfer is not relevant to today's decision.

U.F.T.A. and, thus, enable the trustee to avail himself of § 544(b)(1)'s powers; (2) the defendants' insider status; and whether, if insiders, any of the defendants were (3) "initial transferees;" or (4) persons for whose benefit the transfers were made.

#### a. Existence of a Pre–Transfer Creditor

Turner must demonstrate the existence of an actual unsecured creditor holding an allowable unsecured claim who could avoid the transfers at issue (*i.e.*, a "golden creditor"). *See Williams v. Marlar (In re Marlar)*, 267 F.3d 749, 753 (8th Cir.2001) (existence of two unsecured creditors with standing under Arkansas Fraudulent Transfer Act sufficient for § 544(b) purposes); *See also Panama Williams, Inc. v. Parr (In re Panama Williams, Inc.)*, 211 B.R. 868, 871–72 (Bankr. S.D.Tex.1997) ("[T]he trustee must locate an existing unsecured creditor of the debtor who, on the date of bankruptcy, is able to avoid a transfer of property."); *Lassman v. Goldstein (In re Goldstein)*, 194 B.R. 1, 2–3 (Bankr.D.Mass.1996); *Young v. Paramount Communications, Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 945 (Bankr.S.D.N.Y.1995) ("In order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law.").

Turner has identified twenty-three unsecured creditors listed on both Imageset's internal May 5, 2000, aged payable report and on the schedule of unsecured creditors filed with its bankruptcy petition. In addition, he has submitted copies of proofs of claim filed by nine of those twenty-three creditors. At least one of them, IOS Capital, lists a claim that arose prior to *any* of the transfers at issue in this case.[9] *See* 11 U.S.C. § 502(a) (claim deemed allowed if proof filed under § 501, unless objection filed by party in interest). The defendants have not rebutted Turner's proof. Summary judgment for the plaintiff will enter on the question of the so-called "golden creditor." [10]

#### b. "Insider" Status

The individual defendants, each of whom is an immediate member of Edward Darling, Jr.'s family, are "insiders." They urge, however, that Phoenix is not an insider and contend that the transfers in question were made to Phoenix alone.

Phoenix, a limited liability company, is a juridical entity separate from its members. *See, e.g.*, 31 M.R.S.A. § 645(1) (members not ordinarily liable for debts or obligations of limited liability company). Thus, its insider status vis-a-vis Imageset must be determined separately, notwithstanding the fact that each and every of its members is an Imageset insider. So considered, it is plain that Phoenix does not easily fit within the Maine U.F.T.A.'s express definition of an insider. Phoenix has

9. The first transfer sought to be recovered by the plaintiff occurred on or about January 31, 1999, and was in the amount of $1,217.04. The first large transfer, in the amount of $132,818.84, occurred on or about December 30, 1999.

10. The trustee's piggyback standing produces a symbiosis. His recovery is not limited to the amount that the so-called "golden credi-

tor" alone could recover under Maine law. *See Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 606 (8th Cir. BAP 2003) (reviewing *Moore* and its progeny and declaring that " 'improper transfers may be avoided in their entirety, regardless of the relationship between the size of the transfer and the amount of the unsecured claims' ").

not been shown to be a director, an officer, or a person in control of Imageset. 14 M.R.S.A. § 3572(7)(B)(1)-(3). Neither is it a partnership under Imageset's control or a co-general partner of Imageset. 14 M.R.S.A. § 3572(7)(B)(4) & (5). And, again although each of its members is, it is not a relative of Imageset's management. 14 M.R.S.A. § 3572(7)(B)(6).

Although, collectively, Phoenix's members own more than 20% of Imageset's stock, and although Phoenix served as a conduit in their acquisition of that stock, Phoenix itself holds no Imageset stock. Thus, it is not an Imageset affiliate. Noone contends that Phoenix is or was Imageset's "managing agent," 14 M.R.S.A. § 3572(7)(E).

Turner asserts that, since the funds with which the individual defendants purchased their Imageset shares were funneled through Phoenix, the nature of the relations between and among the individuals, Phoenix, and Imageset demands that the defendants be treated, individually and collectively, as insiders. He argues that, if a group of individuals who themselves are insiders of a debtor form and constitute the entire ownership of a limited liability company whose purpose is exclusively to deal with a debtor entity, then they and the company must be deemed insiders *as a matter of law* with regard to transactions between the company, its agents, and the debtor.

A review of the Maine U.F.T.A.'s provisions counsels me to proceed a bit more cautiously than Turner would have it. Let's say a group of individual insiders, who in the aggregate held more than 20% of the voting shares of a debtor corporation, formed a partnership. A partnership is a "person" under the Maine U.F.T.A. 14 M.R.S.A. § 3572(9). To make that partnership an affiliate (and, therefore an insider), the individuals' shareholdings would have to be aggregated (to equal or exceed 20% ownership of the debtor) *and* attributed to the partnership so that it would be deemed to "directly or indirectly own[ ], control[ ], or hold[ ]" them "with power to vote." *See* 14 M.R.S.A. § 3572(1)(A). Let's assume that, as far as rules concerning who is or is not an affiliate/insider of a debtor corporation, operating through a limited liability company is equivalent to operating by partnership. In our case, aside from the fact of the members' stock ownership (and the curious method by which they arranged their purchases), the record presents no ground for aggregating that stock and attributing it to Phoenix, nor is there any indication that Phoenix had the power to vote it.

Certainly, there are indicia that Phoenix might have held sufficient power to "control" Imageset as to be deemed an insider under the Maine U.F.T.A. *See e.g., Grossman v. Charmoy (In re Craig Systems Corp.)*, 244 B.R. 529, 539 (Bankr.D.Mass. 2000) (recognizing that because statutory definitions of "insider" are non-exclusive, courts often analyze relationships to determine whether the alleged insider sufficiently controls, or has the ability to control, the debtor, or to dictate its policy or use of assets).[11] But, viewed in a light

---

11. In *Schreiber v. Stephenson (In re Emerson)*, 235 B.R. 702, 707 (Bankr.D.N.H.1999), the bankruptcy court set forth the following factual elements to be considered in determining the degree of control of an alleged insider:
    1. Whether the loan made to the debtor was documented (e.g., promissory note, mortgage, and specified repayment terms);

    2. Whether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans;
    3. Whether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements;

favorable to the defendants, the summary judgment record exhibits disputed material facts on the control issue.[12] And, almost uniformly, cases decided on the basis of the elasticity inherent in the insider concept have been determined after trial, on a fully developed evidentiary record. *E.g., In re Craig Systems Corp.*, 244 B.R. at 540 (determination of "insider" status made after trial); *In re Emerson*, 235 B.R. at 707–09 (denying defendants' summary judgment motion, recognizing that question of whether person is an insider is one of fact and appropriate for summary disposition only when underlying facts are not in dispute). Judgment against Phoenix on this record is inappropriate. It has yet to be determined whether the Phoenix is an insider under the Maine UFTA.[13]

#### c. Recovery under § 550

All the individual defendants *are* insiders of Imageset, as a result of their familial relationship with Edward Darling, Jr.[14] Turner argues that recovery against them under § 550 is appropriate. In the case of Edward Darling, Sr. as an initial transferee and in the case of the remaining defendants as initial transferees *or* persons for whose benefit the transfers were made.

#### 1. Defendants Other Than Edward O. Darling, Sr.

With regard to Mary Ellen Darling; Mary Kathleen Fraser; Susan E. Darling; and Mary Kelly, Turner argues that each is an initial transferee as a consequence of her membership interest in Phoenix and their collective right, as the sole members (together with Edward Darling, Sr.) of Phoenix, to receive all distributions from Phoenix.[15] Again, Turner's argument stretches too far. As I stated in *Perrino v. Salem, Inc. (In re Mainely Payroll, Inc.)*, 233 B.R. 591, 598 (Bankr.

---

4. Whether there were numerous loans between the parties;

5. Whether there were any strings attached as to how the debtor could use loan proceeds;

6. Whether the loans were commercially motivated;

7. Whether the transferee had an ability to control or influence the debtor;

8. Whether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an advantage such as that attributable simply to affinity;

9. Whether the transferee had authority to make business decisions for the debtor;

10. Whether there is evidence of a desire to treat the transferee differently from all other general unsecured creditors;

11. Whether there was an agreement among the parties to share profits and losses from business transactions.

12. For example, defendants have submitted evidence in affidavit form that suggests the payments to Phoenix were the result of arms length dealings in which Imageset's commercial lenders were intimately involved, and which they approved.

13. As discussed at the outset, Turner seeks only partial summary judgment on Count XIV of his Complaint, recovery under the Maine UFTA. Turner, of course, will have every opportunity to prove Phoenix's "insider" status at trial. Should he do so (and should he successfully prove the elements reserved for trial), the defendants have admitted that Phoenix was an initial transferee under § 550(a)(1), making it potentially strictly liable for the transfers in question, *Perrino v. Salem, Inc.*, 243 B.R. 550, 553–54 (D.Me. 1999).

14. The point is uncontested and, therefore, is not a subject of the partial summary judgment motion.

15. Of course, if Turner prevailed on this point, the same rationale would apply to Edward O. Darling, Sr. Turner has chosen, however, to focus his express arguments on Darling, Sr.'s liability on the assertion that he is, for other reasons, an initial transferee. That point is addressed below.

D.Me.1999), *rev'd on other grounds*, 243 B.R. 550 (D.Me.1999), the appropriate analysis for a § 550(a)(1) "initial transferee" determination is that set forth in *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir.1988). Under the *Bonded Financial* rubric, a party may be the initial transferee of a transfer if it has, at a minimum, "dominion over the money or other asset, the *right* to put the money to one's own purposes." *Bonded Fin. Servs.*, 838 F.2d at 893 (emphasis added). Here, the payments were made to Phoenix and, in several instances, arguably to Edward Darling, Sr. The individual defendants' only "right" to the transfers was, at best, entirely derivative of their membership interests in Phoenix. They held no direct right to the funds until Phoenix received them and decided what to do with them. I cannot so simply ignore Phoenix, LLC's separate legal existence.

█ Alternatively, Turner argues that M. Darling, Fraser, S. Darling, and Kelly are entities "for whose benefit such transfers were made," under § 550(a)(1), and thus share liability for the transfers on a par with "initial transferees."[16] In Turner's view, the "benefit" received by the individuals was the right to receive the funds paid to Phoenix as a result of their membership interests in Phoenix. While the logic of Turner's position is conspicu-

ous in its simplicity, it also proves too much. If your interest in an entity makes you strictly liable (jointly and severally with the entity) under § 550 every time the entity receives a fraudulent conveyance, wouldn't the same logic extend liability to every shareholder of a corporation to the same degree?[17]

█ As explained in *Bonded Financial*, the paradigmatic "entity for whose benefit the transfer was made" is the debtor or guarantor, whose own liability is reduced or extinguished by the payment made, *as a result of the payment itself*. The benefit must derive directly from the transfer, not from the use to which it is put by the transferee. "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made.'" *Bonded Fin. Servs.*, 838 F.2d at 896. For that reason, the individuals' rights as interest holders in the LLC is not alone sufficient to qualify them as persons "for whose benefit [the] transfer[s were] made" within § 550(a)(1)'s meaning.

### 2. *Edward Darling, Sr.*

█ Darling, Sr. differs from the other individual defendants in at least one crucial respect: some of the payment checks contained his name on their face. The uncontested record reflects that from Jan-

---

**16.** Although I need not decide the issue today, Turner cites my opinion in *Mainely Payroll* for the proposition that a party can be both an initial transferee *and* an entity for whose benefit a transfer is made. *In re Mainely Payroll*, 233 B.R. at 597 n. 8. That view is in conflict with *Bonded Fin., see* 838 F.2d at 895–96 ("We are left with the inference from structure: § 550 distinguishes transferees (those who receive the money or property) from entities that get a benefit because someone else received the money or property."); *see also Perrino v. Salem, Inc.*, 243 B.R. at 561–62 n. 8 (same). Frankly, if a party is one it's not clear to me that it matters if it's the other *as well*. Either way, their liability is the

same. It may well be that the two are, if not in the English language sense (the sense addressed in *Mainely Payroll*) then at least in the § 550 sense, mutually exclusive.

**17.** Turner's logic also leapfrogs lurking, but very real complications. Phoenix's financial affairs are not illuminated by the summary judgment record. As a general rule, if others (*i.e.* creditors) held claims against Phoenix, their right to payment would be superior to Phoenix's members' rights to, or expectation of, distributions by virtue of their membership status. *See* 31 M.R.S.A. §§ 675(1), 705.

uary 31, 1999, through May 21, 1999, Imageset forwarded four mostly-interest payments (totaling $5,920.56) to Darling, Sr. at his home address. The money was deposited into a Phoenix account, and used to reduce Imageset's indebtedness. The checks, which were drawn on an Imageset bank account, were made payable as follows:

PAY
TO THE
ORDER
OF:  Phoenix Partners
    Edward O. Darling
    [Darling's home address]

Turner argues that as a result of Darling, Sr.'s name appearing on the face of the checks as it does, under Maine law he is an alternative payee, authorized to endorse the checks and "put the money to [his] own purposes," *Bonded Fin. Servs.*, 838 F.2d at 893. As such, the theory goes, Darling is an "initial transferee" under § 550(a) and strictly liable for the payments made payable to him. *E.g., Perrino v. Salem, Inc.*, 243 B.R. at 561. Darling, for his part, argues that his name is on the checks merely as an addressee, rather than as a payee, and as such he had no *right* to the funds.[18] Under Maine law, "[t]he person to whom an instrument is initially payable is determined by the intent of the person ... signing as, or in the name or behalf of, the issuer of the instrument." 11 M.R.S.A. § 3–1110(1); *see also id.* cmt. 1 ("If X, as President of Corporation, signs a check as President in behalf of Corporation as drawer, the intent of X controls."). Turner cites subsection (4) of the same statutory provision, which provides rules for alternative payees. Turner asks that I rule that as a matter of law a person, who may not have been the intended payee, be held strictly liable as an initial transferee under § 550(a)(1) if his name appears on the check's face. Darling, Sr. has presented evidence in the form of affidavits that Imageset, the issuer of the checks, acting through its president, intended for there to be one payee, Phoenix. Moreover, the record reflects that what Darling, Sr. actually did with the checks comports in every respect with this intent. He deposited the checks into Phoenix's account, and credited Imageset's indebtedness. *Cf. Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1555 (9th Cir.1996) ("A difference between the name of the payee and the indorsement is irrelevant if the intended payee actually receives the proceeds of the check.... This rule is reflected in the revised version of the Commercial Code: 'The person to whom an instrument is initially payable is determined by the intent of the person ... signing as ... the issuer of the instrument.' Cal. Com.Code § 3110(a).").

In order for Darling, Sr. to be considered an initial payee under the *Bonded Financial* construct, it is not enough merely to demonstrate that a bank could lawfully honor the checks had Darling, Sr.

---

**18.** In support of his position, Darling, Sr. has submitted the affidavits of Mark Beale, President of Imageset during the period in question, and the signatory on the checks, Edward Darling, Jr., Treasurer of Imageset, and himself. Turner, in reply, filed a motion in limine to exclude the affidavits from consideration. Turner is concerned that the affidavits present facts that are either irrelevant, or to the extent relevant their value is outweighed by the danger of confusion of the issues, delay, and needless presentation of cumulative evidence. I disagree. I am capable of discerning what facts are relevant. As for confusion, delay, etc., Turner's complaint rings hollow: He has moved for *partial* summary judgment on *one* count of a fifteen count complaint, all the while seeking to reserve central legal issues for later determination. I can scarcely conceive a legal strategy that could generate as much complexity for so little gain. So the record is clear, the motion in limine is denied.

endorsed them (as a result of an ambiguity on the face of the checks). Darling must have been a named payee in his own right. In other words, there is a distinction to be made between whether Darling, Sr. had the *right* to control the funds represented by the checks, versus whether he had the *ability* to do so.

■ In *Bonded Financial* the Seventh Circuit's decision turned not on the fact that the defendant, European American Bank, was a named payee on the check at issue, but rather on the contractual relationship created by the issuer of the check. "Under the law of contracts, the Bank had to follow the instructions that came with the check. . . . The Bank therefore was no different from a courier or an intermediary on a wire transfer; it held the check only for the purpose of fulfilling an instruction to make the funds available to someone else." *Bonded Fin. Servs.*, 838 F.2d at 893; *see also Rupp v. Markgraf,* 95 F.3d 936, 941 (10th Cir.1996) ("The term 'transferee' must mean something different from 'possessor' or 'holder' or 'agent,' or 'anyone who touches the money.'" Here, [the courier] could only have *prevented* the Markgrafs from exercising dominion and control over the funds if he chose to be an unfaithful courier. . . . All couriers have this type of control. In contrast, the dominion and control test from *Bonded* requires control over the funds and the right to put those funds to *one's own purpose,* not merely the ability to prevent someone else from doing so.)(quoting *Bonded Fin. Servs.,* 838 F.2d at 893–94); *Perrino v. Salem, Inc.,* 243 B.R. at 561 ("limited discretion with respect to transferred funds falls far short of the type of the type of financial freedom" required by *Bonded*). Put simply, an initial transferee must have the *right, not merely the ability,* to exercise dominion and control of the funds.

Material factual issues abound regarding Darling, Sr.'s initial transferee status: In what capacity did he receive the checks at issue? Was he Imageset's intended payee? An agent for Phoenix? Addressee only? What facts could establish Darling, Sr. as the initial transferee with regard to the April 2000 check (the Key Bank payment), considering that it was made payable solely to "Phoenix Financial, LLC" and delivered to Phoenix's counsel?

Moreover, the parties have yet to address issues anent the two large transfers made on or about December 30, 1999: $132,818.84 and $32,705.89. According to Turner, these payments were made payable to Phoenix or Edward O. Darling, in the same fashion as were earlier payments. However, defendants again deny that the checks were "payable" to Darling, Sr. The record does not even contain copies of the checks.[19] And, importantly, any final determination of Darling, Sr.'s liability (for any of the transfers) must await resolution of, *inter alia,* Imageset's insolvency, the defendants' knowledge of its insolvency, and defendants' entitlement to raise Maine law defenses, 14 M.R.S.A. § 3579(6) ("A transfer is not voidable under section 3576, subsection 2: . . . B. If made in the ordinary course of business or financial affairs of the debtor and the insider. . . .").

### Conclusion

For the reasons set forth above, the defendants' motion for summary judgment is denied; the plaintiff's motion in limine is denied; and the plaintiff's motion for summary judgment is granted only with regard to Turner's standing to pursue the transfer avoidance action. The summary judgment record also establishes the un-

---

**19.** Turner supports his assertion only by reference to Imageset's checking account statement, showing that the two checks were cashed in the amounts alleged.

contested facts that each of the individual defendants is, herself or himself, an insider of Imageset; that the transfers under scrutiny did take place; and that Phoenix, LLC was an initial transferee within the meaning of § 550(a)(1). A separate order consistent with these determinations will issue forthwith.