*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to 6th
Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1©.*

**File Name: 14b0001n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:   APPALACHIAN FUELS, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| LIQUIDATING TRUSTEE OF THE APP FUELS | ) | |
| CREDITORS TRUST, | ) | |
| | ) | No. 13-8023 |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BINGHAM GREENEBAUM DOLL LLP, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| _____ | ) | |
| | ) | |

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky
No. 09-10343; Adv. No. 11-1003

Submitted: November 5, 2013

Decided and Filed: January 17, 2014

Before: HARRIS, HUMPHREY and PRESTON, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ON BRIEF:** Allan B. Diamond, DIAMOND McCARTHY LLP, New York, New York, Reda M.
Hicks, Benjamin R. Garry, DIAMOND McCARTHY LLP, Houston, Texas, Greg Taylor, DIAM
McCARTHY LLP, Dallas, Texas for Appellant. Margaret A. Miller, BINGHAM GREENEBAUM

DOLL LLP, Lexington, Kentucky, Reva D. Campbell, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

**GUY R. HUMPHREY**, Bankruptcy Appellate Panel Judge.

### OVERVIEW

The Liquidating Trustee of the App Fuels Creditors Trust ("Liquidating Trustee") pursued an adversary complaint against Paonia Resources, LLC ("Paonia"), Greenebaum Doll & McDonald PLLC[1] ("Bingham Greenebaum") and other defendants seeking to recover fraudulent transfers pursuant to 11 U.S.C. §§ 544, 548 and 550, made in the years prior to the filing of the bankruptcy petition. The complaint alleges that Paonia received a fraudulent transfer in the amount of $4,740,220 from the Debtor Appalachian Fuels, LLC ("AppFuels"). Of this amount, the Liquidating Trustee seeks to recover a $223,000 payment made by Sentinel Energy, LLC ("Sentinel") to Bingham Greenebaum for legal fees. Recovery is sought from Bingham Greenebaum as a mediate transferee. Bingham Greenebaum filed a motion for summary judgment asserting the good faith transferee defense provided in 11 U.S.C. § 550(b)(1). The bankruptcy court granted summary judgment in Bingham Greenebaum's favor, and the Liquidating Trustee appealed the bankruptcy court's order. For the reasons that follow, the Panel reverses the bankruptcy court's order granting summary judgment.

### STATEMENT OF ISSUE

This appeal presents the discrete issue of whether the bankruptcy court erred in granting summary judgment on the grounds that the Bingham Greenebaum had neither actual nor constructive knowledge of the potential voidability of the transfer of certain settlement funds and thus was entitled to the good faith transferee defense provided in § 550(b)(1).

_____

[1] Effective January 2, 2012, Greenebaum Doll & McDonald PLLC merged with Bingham McHale LLP to form a new law firm known as Bingham Greenebaum Doll LLP.

2

**JURISDICTION AND STANDARD OF REVIEW**

The Bankruptcy Appellate Panel of the Sixth Circuit ("Panel") has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to the Panel, and no party has timely filed to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right. 28 U.S.C. § 158(a)(1). For the purpose of an appeal, a final order is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. U.S.*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989). An order granting summary judgment is a final order. *Menninger v. Accredited Home Lenders* (*In re Morgeson*), 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007).[2]

A bankruptcy court's final order granting summary judgment is reviewed *de novo*. *Id.* "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Id.* (quoted in *Buckeye Check Cashing, Inc. v. Meadows* (*In re Meadows*)*,* 396 B.R. 485, 488 (B.A.P. 6th Cir. 2008)). Essentially, the reviewing court decides the issue "as if it had not been heard before." *Mktg. & Creative Solutions, Inc. v. Scripps Howard Broad. Co.* (*In re Mktg. & Creative Solutions, Inc.*), 338 B.R. 300, 302 (B.A.P. 6th Cir. 2006).

---

[2] In another adversary proceeding related to the Debtors' estates, the United States District Court for the Eastern District of Kentucky determined that the bankruptcy court had the constitutional authority to enter final judgment on claims for fraudulent transfers. *Official Comm. of Unsecured Creditors of Appalachian Fuels LLC v. Energy Coal Res. (In re Appalachian Fuels, LLC)*, 472 B.R. 731 (E.D. Ky. 2012).

# FACTS

Between 2001 and 2009, AppFuels and its affiliates, including other related debtors,[3] were in the business of mining coal in central Appalachia.

In April 2009, in a state court action, Phillip Morris USA, Inc. ("Philip Morris") obtained summary judgment holding AppFuels liable for breach of a coal supply agreement, which ultimately led to a $15 million consent judgment in favor of Phillip Morris. On May 26, 2009, in part due to its liability to Phillip Morris, AppFuels filed an assignment for the benefit of creditors to begin winding down and liquidating its operations.

On June 11, 2009, RAMCO Trucking, Inc., Phillip Morris, and Kentucky Oil and Refining Company, filed an involuntary Chapter 7 petition against AppFuels. On June 26, 2009, AppFuels filed an answer to the involuntary petition, bankruptcy schedules, and a motion to convert its Chapter 7 bankruptcy case to Chapter 11, which was granted by the bankruptcy court. The related Debtors also filed voluntary Chapter 11 petitions.[4] In July 2009, the bankruptcy court entered orders authorizing the joint procedural administration of the Debtors' cases.

On July 14, 2009, the United States Trustee appointed the Committee of Creditors Holding Unsecured Claims ("Creditors' Committee") in AppFuels' Chapter 11 case pursuant to 11 U.S.C. § 1102(a).

On April 15, 2011, the Creditors' Committee filed a complaint on behalf of the related Debtors' estates to "avoid and recover cash, valuable machinery and other assets that were

---

[3] The other related debtors include: Appalachian Environmental, LLC; Appalachian Holding Company, Inc.; Appalachian Premium Fuels, Inc.; Kanawha Development Corporation; Appalachian Coal Holdings, LLC; and Southern Eagle Energy, LLC ("related Debtors," collectively with AppFuels, the "Debtors"). As to the related Debtors, the parent (holding) company is Appalachian Holding Co., Inc., which is the 100% owner of the related Debtors.

[4] Appalachian Environmental, LLC (Case No. 09 10374); Appalachian Holding Company, Inc. (Case No. 09 10373); Appalachian Premium Fuels, Inc. (Case No. 09 10373); and Kanawha Development Corporation (Case No. 09 10375); Appalachian Coal Holdings, LLC (Case No. 09 10405); and Southern Eagle Energy, LLC (Case No. 09 10406).

fraudulently transferred to defendants Bowie Resources, LLC ("Bowie"), Paonia, and other defendants in the months and years prior to the filing of the bankruptcy case."[5] Adv. Dkt. No. 1. The other defendants, including Bingham Greenebaum, received subsequent transfers from the initial transferees. The claims set forth in the complaint only concern damage to AppFuels and not the other related Debtors. The complaint was amended on April 20, 2011, and further amended on June 10, 2011. Although the second amended complaint discusses many parties and numerous transfers made by AppFuels, the instant appeal concerns only the Liquidating Trustee's action against Bingham Greenebaum only seeks to recover a single transfer made to Bingham Greenebaum in the amount of $223,000 for the payment of legal fees ("Greenebaum Transfer").

The Greenebaum Transfer was to compensate the law firm for its representation of Paonia in certain legal matters ("Paonia matters"). Paonia was created to acquire stock of Bowie from its affiliated entities, Energy Coal Resources, Inc. ("ECR") and Colorado Holding Company, Inc. ("CHC").[6] On June 24, 2008, Paonia entered into an option agreement with ECR and CHC ("Option Agreement"). AppFuels was not a party to the Option Agreement. Pursuant to the Option Agreement, Paonia loaned $4 million to ECR for the benefit of Bowie, a company related to ECR that was experiencing "cash flow problems." Paonia also acquired an option to purchase a majority interest (75%) in Bowie from Bowie's parent company, CHC, and agreed to provide Bowie additional working capital, as necessary, during the term of the option. The Option Agreement provided that ECR would not have to repay the $4 million unless it failed to close on the sale after Paonia exercised its option. If ECR failed to close on the sale, it would owe Paonia a required breakup fee in the amount of $10 million, plus it would have to repay the $4 million promissory note.

On September 19, 2008, Paonia gave notice of its intent to exercise its option. On September 24, 2008, ECR and CHC filed a lawsuit against Paonia in Boyd County, Kentucky Circuit Court seeking a temporary restraining order ("TRO lawsuit"). Bingham Greenebaum represented Paonia

---

[5] On January 23, 2012, the Liquidating Trustee was substituted for the Committee. The Liquidating Trustee adopted the Committee's pleadings.

[6] AppFuels was an indirect wholly owned subsidiary of ECR. ECR owns 100% of CHC, which holds a 99% membership interest in Bowie. Therefore, Bowie was an "affiliate" of AppFuels.

in the TRO lawsuit. AppFuels was not a party to the TRO lawsuit. ECR and CHC alleged that Paonia had breached the Option Agreement.[7] The court granted ECR and CHC's request for a temporary restraining order enjoining the closing of the purchase of Bowie scheduled for September 29, 2008. Paonia subsequently removed the TRO lawsuit from Kentucky Circuit Court to the United States District Court for the Eastern District of Kentucky.

On September 30, 2008, Paonia filed an answer and counterclaim. On October 3, 2008, Paonia filed an Expedited Motion for Injunctive Relief requesting: (1) specific performance of the Option Agreement; (2) an order enjoining ECR and CHC from breaching the Option Agreement and disposing of assets at issue in the litigation; and (3) an order requiring ECR and CHC to post security to guarantee that Paonia receives full relief. In seeking injunctive relief, Paonia argued that Bowie, ECR, and CHC were insolvent. Bowie, ECR, and CHC responded that there was no evidence to support Paonia's assertion that the parties were insolvent and would not be able to pay the $14 million that would be due under the Option Agreement, if the court so determined. The District Court denied Paonia's motion seeking an injunction, finding that there was no basis for expedited specific performance. On October 1, 2008, ECR and CHC consented to the dissolution of the TRO.

On December 19, 2008, ECR, CHC, Paonia, Bowie, and other parties entered into a settlement agreement ("Settlement Agreement") (Adv. Dkt. No. 40, Summ. J. Mot., Ex. A). The Settlement Agreement resolved issues that arose during the TRO lawsuit and required ECR, CHC, or Bowie to pay Paonia $4,740,220. Section 2 of the Settlement Agreement states:

> 2.    Settlement. In full and final satisfaction of the Dispute, in addition to their other obligations under this Agreement:
>
> a.    ECR and CHC shall, or shall cause Bowie to, pay to Paonia the amount of $4,740,220.00 immediately following the execution and delivery of this Agreement, but in no event later than December 23, 2008.

---

[7] CHC and ECR alleged that Paonia had failed "to deliver on a request for funding made by Bowie pursuant to Section 5 of the Option Agreement." (Adv. Dkt. No. 68, Liq. Tr.'s Resp. to Summ. J. Mot., Ex. C, p. 2). Section 5 of the Option Agreement required Paonia to "work diligently and in good faith with the management of the [Bowie] Company to determine the working capital needs of the [Bowie] Company. . . ." *Id.*

*Id*. The payment referred to in the Settlement Agreement was paid, not by ECR, CRC or Bowie, but instead by AppFuels to Paonia on or about December 24, 2008 ("Settlement Transfer"). Paonia then transferred a portion of the money, $225,000, to Sentinel, a company owned or controlled in part by defendant John Siegel.[8]

On December 29, 2008, Bingham Greenebaum received the Greenebaum Transfer in the form of a check from Sentinel in the amount of $223,000. Most of the Greenebaum Transfer ($220,008.51) was allocated to pay legal fees related to work done on the Paonia matters.

The adversary complaint at issue was filed in part to recover the Greenebaum Transfer. Bingham Greenebaum ultimately filed a summary judgment motion and argued that the Liquidating Trustee could not recover from the law firm because the firm was a good faith transferee under § 550(b)(1). In support, Bingham Greenebaum submitted: (1) the Settlement Agreement dated December 19, 2008; (2) a one page spreadsheet showing the allocation of Greenebaum Transfer; (3) email correspondence related to the TRO lawsuit and (4) the Affidavit of Andrew Fleischman, a member of Bingham Greenebaum from 2006 to 2009.

The Liquidating Trustee disputed Bingham Greenebaum's lack of knowledge of the voidability of the transfer. The Liquidating Trustee submitted evidence it alleged showed that Bingham Greenebaum knew or should have known the transfer was voidable, including: (1) excerpts from the deposition of Andrew Fleischman; (2) filings by Bingham Greenebaum in the TRO lawsuit and (3) email correspondence dated December 22, 2008.

For purposes of the summary judgment motion only, the parties agreed that the bankruptcy court should assume: (1) that the transfer at issue was a fraudulent transfer subject to avoidance and recovery; (2) that Bingham Greenebaum is a mediate transferee who has the burden of showing the good faith transferee defense applies under these facts; and (3) that Bingham Greenebaum took the December 29, 2008 fee payment for value and in good faith. Therefore, the only issue under

---

[8] John Siegel also owned Paonia. Bingham Greenebaum alleged in its original Summary Judgment Motion that Sentinel had previously paid bills for Paonia.

§ 550(b)(1) for the court to determine was whether a genuine issue of material fact existed as to whether the Greenbaum Transfer was received by Bingham Greenebaum without knowledge of the voidability of the transfer and whether the law firm was entitled to judgment as a matter of law.

On March 1, 2012, the bankruptcy court issued a Memorandum Opinion and Order denying Bingham Greenebaum's Summary Judgment Motion. The court held that:

> While Bingham Greenebaum meets its burden as to Andrew Fleischman, it fails to meet its burden for the named party, the law firm. The parties do not dispute attorneys other than Fleischman worked on Paonia matters. The materials of record, however, focus on the lack of knowledge of the voidability of the Transfer possessed by Fleischman. The materials of record do not meet the burden with respect to the entire law firm.

Adv. Dkt. No. 71, Memo. Op., p. 5; Dkt. No. 72, Order Overruling Summ. J. Mot.. The court did not consider the "weight of the Trustee's arguments," since Bingham Greenebaum failed to meet its initial burden of proof. *Id*.

On March 23, 2012, Bingham Greenebaum filed a Renewed Motion for Summary Judgment and a supporting Memorandum ("Renewed Motion"). Bingham Greenebaum supplemented the materials provided with the original summary judgment motion, with time sheets detailing time allocated to the Paonia matters and affidavits of three attorneys from Bingham Greenebaum who worked on the Paonia matters, Janet P. Jakubowicz, Margaret Miller, and C.R. Bowles. Bingham Greenebaum argued that the materials provided proof that no attorney working on any of the Paonia matters knew or should have known that the Settlement Transfer or the Greenebaum Transfer were recoverable. Thus, the good faith transferee defense of § 550(b) bars the trustee from recovering the Greenebaum Transfer.

The Liquidating Trustee responded to the Renewed Motion arguing that there was still a genuine issue of material fact as to whether Bingham Greenebaum had actual or constructive knowledge of the voidability of the Settlement Transfer. The Liquidating Trustee states that the disputed facts include:

8

1) Whether the receipt of an email by Margaret Miller and Janet Jakubowicz and separately by Andrew Fleischman, indicating that monies to repay the Paonia Option would come from Appalachian Fuels, should have put Greenebaum on notice that the Settlement Transfer would be made by Appalachian Fuels.

2) Whether the receipt, by Andrew Fleischman, of an email that specifically discusses payment of the Settlement Transfer to Paonia by "Appalachian Fuels," should have put Greenebaum on notice that the Settlement Transfer was being made by Appalachian Fuels[.]

3) Whether knowledge that the Settlement Transfer was being made by Appalachian Fuels, coupled with the fact that Appalachian Fuels otherwise had no dealings with Paonia and had no reason to make any transfer to Paonia gave rise to constructive knowledge that the Settlement Transfer was made without consideration.

4) Whether the multiple statements made by Greenebaum attorneys in the context of the TRO suit, claiming, for example, that "Ernst & Young gave a draft of a 'Going Concern letter' to ECR in 2008 as a result of ECR and Appalachian Fuels, Inc. [sic] mounting losses and dire financial conditions" provided Greenebaum with constructive knowledge of Appalachian Fuels Insolvency.

Adv. Dkt. No. 76, Liq. Tr.'s Resp. to Renewed Summ. J. Mot., p. 6 (footnotes omitted).

The Liquidating Trustee supplemented the materials submitted in response to Bingham Greenebaum's original summary judgment motion with the deposition transcript of John Siegel and three email messages exchanged in the months prior to the Settlement Transfer and Greenebaum Transfer. The Liquidating Trustee also relied on filings from the TRO lawsuit regarding the financial condition of ECR, CHC, Bowie and related entities, including AppFuels.[9] *Id*. Bingham Greenebaum filed a reply and included excerpts from a hearing held in District Court on October 8, 2008, in the TRO lawsuit.

On April 30, 2012, the bankruptcy court held a hearing and considered counsels' arguments. Just as with the original summary judgment motion, the parties agreed that the court should assume that the Settlement Transfer was a fraudulent transfer subject to avoidance and recovery by the

---

[9] The Liquidating Trustee and Bingham Greenebaum do not dispute the existence of the email messages or the allegations in the pleadings and papers filed in the TRO lawsuit.

Liquidating Trustee; that Bingham Greenebaum was a mediate transferee and has the burden of showing that the good faith transferee defense applies; and that Bingham Greenebaum took the Greenebaum Transfer for value and in good faith.

On May 21, 2012, the bankruptcy court issued a Memorandum Opinion and Order granting Bingham Greenebaum's Renewed Motion.[10] The bankruptcy court determined that Bingham Greenebaum had neither constructive nor actual knowledge of the potential voidability of the Settlement Transfer. The bankruptcy court also concluded that the "Liquidating Trustee ha[d] presented no affirmative evidence providing sufficient proof a reasonable person in the position of the Bingham Greenebaum attorneys working on the Paonia matters would have actual or constructive knowledge that the Settlement Transfer was recoverable."[11]

On April 18, 2013, the bankruptcy court entered an agreed order dismissing the remaining claims in the adversary proceeding. On May 2, 2013, the Liquidating Trustee filed a timely notice of appeal of the bankruptcy court's order granting Bingham Greenebaum's renewed summary judgment motion.

---

[10] *See Liquidating Trustee of App Fuels Creditors Trust v. Bowie Res., LLC* (*In re Appalachian Fuels, LLC*), 473 B.R. 191 (Bankr. E.D. Ky. 2012).

[11] On June 19, 2012, the Liquidating Trustee moved for the entry of a final judgment pursuant to Federal Rule of Civil Procedure 54(b), as incorporated by Federal Rule of Bankruptcy Procedure 7054. Bingham Greenebaum objected. On August 21, 2012 the bankruptcy court denied the Trustee's motion. On April 4, 2013, an Agreed Judgment was entered by the bankruptcy court granting a settlement agreement whereby App Fuels Creditors Trust would recover from Paonia the total sum of $4,247,220 and any postjudgment interest. On April 18, 2013, an Agreed Order of Dismissal was entered as to the remaining parties.

**DISCUSSION**

I. <u>Summary Judgment Standard</u>

Summary judgment in adversary proceedings is governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56. Summary judgment is proper if the moving party establishes that there are no genuine issues of material fact on an essential element of the nonmoving party's case and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). A fact is material if it would affect the determination of the underlying action. *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Once the moving party has met its burden, the burden of proof shifts to the nonmoving party to "come forward with evidence which, if believed, would support a finding in its favor or, stated otherwise, such evidence as would entitle it to 'successfully resist a motion for directed verdict.' " *Wasserman v. Bressman* (*In re Bressman*), 327 F.3d 229, 237 (3d Cir. 2003) (citation omitted).

"When determining whether the evidence is sufficient, the trial court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury." *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 n.19 (6th Cir. 1991) (citation omitted). Instead, the evidence must be viewed in the light most favorable to the nonmoving party drawing all reasonable inferences in its favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

> "Although [the court] must draw all inferences in favor of the nonmoving party, it must present significant and probative evidence in support of its complaint. 'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party].' "

*Gibson v. Gibson* (*In re Gibson*), 219 B.R. 195, 198 (B.A.P. 6th Cir. 1998) (quoting *Hall v. Tollett*, 128 F.3d 418, 421-22 (6th Cir. 1997)). The central question is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

## II. Avoidance and Recovery of Prepetition Transfers under 11 U.S.C. § 550

When transfers from a bankruptcy debtor are avoided under certain provisions of the Bankruptcy Code,[12] the trustee relies on § 550 for the power to recover the money or property. The purpose of these provisions is to protect creditors from "last minute diminutions" of the debtor's property shortly before the filing of the bankruptcy case. *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988). Section 550(a) states in relevant part:

> (a) [T]he trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). Under § 550(a), the trustee may recover property transferred from the initial transferee or any "immediate" or "mediate" transferee of the initial transferee.[13] *Id.* However, § 550(b) affords a complete defense to a subsequent transferee provided the transferee takes the transfer: (1) for value; (2) in good faith; and (3) without knowledge of the voidability of the transfer avoided. 11 U.S.C. § 550(b)(1). Section 550(b) states:

> (b) The trustee may not recover under section (a)(2) of this section from

---

[12] A transfer may be avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a) of Title 11. *See* 11 U.S.C. § 550(a).

[13] "A mediate or immediate transferee is simply one who takes in a later transfer down the chain of title or possession." *First Nat'l Bank of Barnesville v. Rafoth* (*In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d 712, 722 (6th Cir. 1992).

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b).

In this appeal, the parties do not dispute that Bingham Greenebaum is a mediate transferee that took the transfer for value and in good faith. The issue on appeal concerns the third element of the good faith transferee defense, whether the Greenebaum Transfer was taken "without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). Neither the Bankruptcy Code nor the legislative history defines the third element of the good faith transferee defense under § 550(b)(1). *See Stevenson v. Genna* (*In re Jackson*), 426 B.R. 701, 707-08 (Bankr. E.D. Mich. 2010) (holding that "[t]here is no straightforward definition of good faith or knowledge of voidability," as those terms are used in the statutory exception to liability of transferees on avoided transfers, but the two concepts overlap), *aff'd* 436 B.R. 29 (E.D. Mich. 2010). However, the Sixth Circuit in *I.R.S. v. Nordic Village, Inc.* (*In re Nordic Village, Inc.*), 915 F.2d 1049 (6th Cir. 1990), *rev'd on other grounds*, 503 U.S. 30, 112 S. Ct. 1011 (1992), held that "[t]he requirement of knowledge is satisfied if the transferee 'knew facts that would lead a reasonable person to believe that the property transferred was recoverable.' " *Nordic Village*, 915 F.2d at 1055 (quoting *Smith v. Mixon* (*In re Mixon*), 788 F.2d 229, 232 n.2 (4th Cir. 1986)). The Seventh Circuit in *Bonded Fin. Servs.* explained that a creditor does not have a duty to investigate for the creditor's benefit: "A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." 838 F.2d at 898. Moreover, the term "knowledge" requires more than just notice. *Id.* (citing *In re Mixon*, 788 F.2d at 232). However, "some facts suggest . . . other facts" and "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge." *First Independence Capital Corp. v. Merrill Lynch Bus. Fin. Servs. Inc.* (*In re First Independence Capital Corp.*), 181 F. App'x. 524, 529 (6th Cir. 2006) (quoting *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1357 (8th Cir. 1995)).

This issue has been raised in other cases involving the specific context of legal fees received by law firms as mediate transferees. In *In re Bressman*, 327 F.3d 229 (3rd Cir. 2003), the trustee sought to recover unauthorized postpetition transfers. The Third Circuit Court of Appeals held that the trustee failed to come forward with *any probative evidence* to suggest the law firm was aware funds came from estate assets. *Id.* at 239. The only evidence offered by the trustee was the law firm's knowledge that the trustee was investigating whether the payments came from estate assets. The law firm committed not to accept payments from estate funds, and the trustee had no probative evidence that the law firm was aware of facts to suggest they were accepting estate funds. *Id.* at 238-39. In *Stevenson,* 436 B.R. at 34-35, the only evidence that the trustee provided was that the law firm knew that the debtor was contemplating bankruptcy. *See also SKK Liquidation Trust v. Green & Green, LPA* (*In re Spinnaker Indus., Inc.*), 328 B.R. 755, 768-69 (Bankr. S.D. Ohio 2005) (summary judgment motion by law firm did not establish facts to show § 550(b)(1) defense applied).

### III. The Issue of "Constructive Knowledge" May Be Decided on Summary Judgment.

The issue of constructive knowledge is generally an issue of fact; however, it is an issue "that *can be decided on a summary judgment motion* if the movant can show that no issues of material fact exist regarding this issue." *Charash v. Oberlin College*, 14 F.3d 291, 299-300 (6th Cir. 1994) (emphasis added); *F.D.I.C. v. Alexander*, 78 F.3d 1103, 1109 (6th Cir. 1996) (similar). This principle applies in the context of § 550(b)(1). *See also Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 239 F.3d 365, 2000 WL 1741550, at *6 (5th Cir. 2000) (table) (voidability of a transfer is question of fact); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenerette Sec. Corp.*, 351 F. Supp. 2d 79, 107 (S.D.N.Y. 2004) (similar).

### IV. The Bankruptcy Court Committed Reversible Error When It Granted Summary Judgment.

The bankruptcy court's order granting summary judgment is subject to *de novo* review. *Morgeson*, 371 B.R. at 800. The first question is whether the evidence presented by Bingham Greenebaum establishes that there were no genuine issues of material fact, thereby shifting the burden to the Liquidating Trustee to come forward with evidence demonstrating that there was a genuine issue for trial. Bingham Greenebaum must come forward "with credible evidence . . . that

would entitle [the firm] to a directed verdict if not controverted at trial." *Celotex Corp.* 477 U.S. at 331.

A.    Bingham Greenebaum Came Forward With Evidence to Support a Finding In Its Favor.

In support of its Renewed Motion, Bingham Greenebaum submitted affidavits of the four attorneys that worked on the Paonia matters, specifically: (1) Andrew Fleischman ("Fleischman"); (2) Janet Jakubowicz ("Jakubowicz"); (3) Margaret Miller ("Miller"); and (4) C.R. Bowles ("Bowles"), as well as the deposition testimony of Fleischman. Bingham Greenebaum argues that this evidence demonstrates that the law firm had no knowledge or reason to know facts that would have led it to inquire into the source of the Greenebaum Transfer. In his affidavit and deposition testimony, Fleischman asserts that he had no knowledge or reason to know of the financial condition of AppFuels. Fleischman states that in the context of the TRO lawsuit while Bingham Greenebaum had "general concerns" about ECR's financial health, it did not have "comprehensive knowledge of ECR's financial condition," or that of ECR's subsidiaries. Adv. Dkt. No. 68, Ex. B, Fleischman's Depo., p. 61, 75). Due to the expedited nature of the TRO lawsuit, Fleischman testified that Bingham Greenebaum did not ask for financials or hire an investigator or financial auditor, and their concerns were based on "what was being heard in the industry." *Id*. at 75. This is consistent with Miller's affidavit that provides that "[p]rior to settlement, most of the activity in the TRO Suit was limited to motion practice. Because discovery was in its early stages, Bingham Greenebaum had obtained limited information about Energy Coal Resources' financial condition when settlement was reached." Adv. Dkt. No. 73, Ex. G ¶ 6.

Fleischman further contends that Bingham Greenebaum had no knowledge or reason to know that AppFuels was funding the Settlement Transfer. Fleischman testified in his deposition that he knew of ECR's relationship with Bowie and CHC, and in 2008 became "aware of the existence of another branch of the company called Appalachian Fuels." Adv. Dkt. No. 73, Ex. B, Fleischman's Depo., p. 20. Fleischman also states that he did not have information that would lead him to believe that the Settlement Transfer was being funded by AppFuels since AppFuels was not a party to the TRO lawsuit and the Settlement Agreement provided otherwise. Adv. Dkt. No. 40, Ex. D,

Fleischman's Aff., ¶ 16.  Fleischman also did not inquire about who was funding the Settlement Transfer because he understood that ECR's income came from different sources including "short-term borrowing from one [entity] to another," "from the Addingtons[14] personally," "inner company payables," "contributions of its shareholders, or others that would invest money directly into ECR." Adv. Dkt. No. 76, Ex. A, Fleischman Depo., pp. 62, 88-89.  Fleischman also refers to an email sent to him by ECR's attorney after the Greenebaum Transfer was made requesting that he provide ECR with "a detailed breakdown of the approx. $4.7 million that was wired to Paonia." Adv. Dkt. No. 40, Ex. D, Fleischman's Aff., ¶ 18.  Fleischman suggests that from this email he understood that ECR had made the Settlement Transfer payment.

Finally, Fleischman asserts that he had no knowledge or reason to know that the Greenebaum Transfer was paid out of the Settlement Transfer funds.  Fleischman states that in the ordinary course of business at Bingham Greenebaum he did not inquire as to the source of fee payments, even though he would have been advised by a member of the firm's accounting staff that it had been paid. Fleischman also knew that John Siegel, the owner of both Paonia and Sentinel, had his own personal wealth as a result of certain credit transactions, and that Sentinel had paid Paonia's legal bills in the past.

The affidavits of Jakubowicz, Miller, and Bowles show that they were not involved in billing matters and did not receive notice of payments made by Paonia.  Jakubowicz states that she was only involved in the TRO lawsuit up to when the District Court denied Paonia's motion for injunctive relief, and not the subsequent settlement negotiations.  Thus, she would not have had any knowledge or reason to know that the Settlement Transfer would be paid by AppFuels or that any of the funds from the Settlement Transfer would be used to make the Greenebaum Transfer.  Miller's affidavit also reveals that she was not involved in the settlement discussions, rather her work consisted mainly of motion practice that took place prior to settlement discussions.  Lastly, Bingham Greenebaum submitted the affidavit of C.R. Bowles ("Bowles"), a bankruptcy attorney for Bingham Greenebaum. Bowles had limited involvement in the Paonia matters and states that he was only responsible for advising Paonia about a potential Bowie bankruptcy during the TRO lawsuit.  As such, he had no

---

[14] Stephen Addington was president of all the Debtors, including AppFuels, and the president and CEO of ECR.

16

knowledge or reason to know of the settlement discussions or Settlement Agreement entered into by the parties, or who would be making the Settlement Transfer or the Greenebaum Transfer.

The affidavits and deposition testimony of Fleischman and the corroborating affidavits of Jakubowicz, Miller, and Bowles, in the absence of evidence to the contrary, would support a finding in Bingham Greenbaum's favor that it took the transfer without knowledge of the voidability of the Settlement Transfer.[15] Thus, the court did not err in finding that Bingham Greenebaum adequately supported its Renewed Motion. However, the issue before the Panel is whether the Liquidating Trustee, as the nonmovant, presented affirmative evidence demonstrating that there was a genuine issue for trial.

### B. The Liquidating Trustee Established There Was a Genuine Issue for Trial.

The Liquidating Trustee relies on three emails in support of his argument that Bingham Greenebaum had either actual or constructive knowledge of the voidability of the Settlement Transfer. The first email, dated September 15, 2008, was sent by Stephen Addington to Siegel, a principal of Paonia, and later forwarded to Jakubowicz and Miller. In this email, Addington explains that ECR is seeking an extension to repay the $4 million loan and that the funds would be provided by AppFuels. Adv. Dkt. 76, Ex. B. The email states that AppFuels will be paying the $4 million loan from the Option Agreement. The email was exchanged prior to the initiation of the TRO lawsuit and more than three months prior to the execution of the Settlement Agreement, and payments of both the Settlement Transfer and Greenebaum Transfer. The email indicates that it was "redacted" and forwarded to Jakubowicz and Miller on October 20, 2008, more than one month after the original email was sent. In the email Siegel states:

> In case your thinking and / or funding is impacted by this crazy capital market, I wanted to know if we could extend the time frame to repay the $4.0 mm loan to 60 days?

---

[15] The bankruptcy court ruled in its denial of Bingham Greenebaum's original Summary Judgment Motion that Fleischman met his initial burden of proof.

We are also being held up on our capital raising efforts, however, the operations at Appalachian Fuels are building to a fairly positive operating cash flow and I believe that we can repay the $4.0 mm from this cash flow within 60 days. Since the Bowie cash flow is tied up with the GE financing, we will have to provide the funds to ECR from App Fuels.

Let me know if this is acceptable.

*Id*.

This email first tells Jakubowicz and Miller that the loan related to the Option Agreement will be paid by AppFuels, a nonparty to the litigation. Additionally, the email is consistent with allegations in the subsequent TRO lawsuit that AppFuels as well as other affiliated corporate entities had been in difficult financial straits. It appears AppFuels could not pay the $4 million immediately.

The second email, dated September 16, 2008, is Siegel's response to the September 15, 2008, email from Stephen Addington, with a carbon copy to Fleischman. Adv. Dkt. 76, Ex. C. In this email Siegel states he does not understand the prior email regarding payment of the $4 million loan and puts Addington on notice that Paonia has all of its funding in place and intends to close on its option. This email shows Fleischman also received the September 15th email and, for purposes of summary judgment, the court must assume he knew AppFuels was going to try to repay the loan.

Finally, the third set of emails is an email chain sent from Siegel to Stephen Addington with a copy to Fleischman much closer to the time of transfer by AppFuels to Paonia. Adv. Dkt. No. 68, Ex. E. The email chain begins with a message dated December 22, 2008, in which Scott Dyer, an employee of AppFuels, inquires about an invoice that is owed to AppFuels and asks about "the expected date and amount of any wires that Appalachian Fuels will be receiving from Noble." *Id*. Mr. Blumenfeld replies the same day that the invoice will "be paid in full on Dec. 24." *Id*. The last string in the email chain is from Siegel to Stephen Addington with a copy to Fleischman in which Siegel asks Stephen Addington to try to move up Noble's payment to AppFuels by one day because the "large settlement is structured around payment." *Id*. In this regard, the bankruptcy court held:

> Fleischman's knowledge of a relationship between Appalachian Fuels and the parties to the settlement agreement does not create a duty to investigate where Fleischman had no knowledge of how funds were transferred between the related entities, the

18

reason for the transfers, or whether the related entities provided value in exchange for the transferred funds. There could be a number of legitimate scenarios under which Appalachian Fuels would transfer funds to related entities. While the Legal Counsel Email Messages show exchanges on which Bingham Greenebaum attorneys were copied, the Liquidating Trustee has not presented affirmative evidence connecting the dots and demonstrating the attorneys had reason to suspect the Settlement Transfer was a voidable transfer.

Adv. Dkt. No. 81, Memo. Op., p. 7.

But, placing the evidence in a favorable light to the Liquidating Trustee, Bingham Greenebaum had reason to know that the reason AppFuels was funding the Settlement Transfer was not necessarily because of legitimate intercompany transfers or other "legitimate scenarios," but perhaps because none of the three entities which were obligated to pay the funds under the Settlement Agreement were able to do so. In fact, little in the record provides a specific reason for AppFuels paying the settlement. Instead, the record can be reasonably interpreted that AppFuels paid the settlement, despite any apparent consideration or role in the TRO lawsuit or settlement, for the simple reason that it was receiving funds from Noble Energy that allowed it to do so. Unlike other affiliated corporate entities, including the three parties listed in the Settlement Agreement to pay that settlement, AppFuels would, upon receipt of the Noble Energy funds, have the ability to pay.

Fleischman had reason to know that AppFuels' payment of the settlement may have been because of the financial problems of the settlement parties, and that AppFuels made the payment despite the fact that it lacked "positive cash flow" prior to the Noble Energy receivable being paid. The information given to Bingham Greenebaum was essentially that AppFuels, a nonparty to the Settlement Agreement, would pay the settlement when it could. This fact, combined with the 2008 going concern letter discussed below, suggests the payment may have left AppFuels insolvent. In addition, it squarely raises the issue of constructive knowledge as to equivalent value for the payment. While such a theory could ultimately fail at trial, giving the Liquidating Trustee the benefit of reasonable inferences from the evidence, it is not unreasonable to conclude that Bingham Greenebaum had constructive knowledge of the voidability of the transfer to Paonia sufficient to inquire why AppFuels was making this payment, contingent upon receiving a specific account receivable from Noble Energy.

In addition to these emails, the Liquidating Trustee cites to multiple statements made by Bingham Greenebaum attorneys in the context of the TRO lawsuit that ECR and its subsidiaries were insolvent, as evidence that Bingham Greenebaum had constructive knowledge of the voidability of the Settlement Transfer.  The statements the Liquidating Trustee relies on are:

"The parties' June 2008 Agreement was forged in the midst of a severe financial crisis at the mine, when its very survival was at stake and Plaintiffs were desperately in need of the financial lifeline that Paonia offered them."

"Paonia has serious doubts as to Sellers' continuing solvency and ability to satisfy even a money judgment consistent with the Option Agreement . . . ."

"Based on our cursory review of recent lawsuits, it appears Plaintiffs and/or their affiliates are currently involved in no less than 14 lawsuits, with claims asserted against them totaling in excess of $100,000,000 in damages.

"Significantly, Plaintiffs not only seek to avoid closing on the agreed upon transaction, they have also trumped up charges that Paonia somehow breached the Option Agreement so as to avoid paying Paonia the $10,000,000 break up fee and repaying the $4,000,000 loan which Paonia provided to Plaintiffs in order to keep the Bowie Mine operational when it was on the brink of financial disaster . . . ."

"Marilyn Runyan, an ECR accountant, will confirm the fact that Ernst & Young gave a draft of a 'Going Concern Letter' to ECR in 2008 as a result of ECR and Appalachian Fuels, Inc.'s [sic] mounting losses and dire financial conditions."

"Jim Wolfe was the former CFO of ECR through 2007. Wolf will confirm that ECR received a draft of a "Going Concern Letter' from Ernst & Young for calendar year 2007, as well as the extent to which ECR's companies were consistently in serious arrears to virtually all of the vendors and that the company, for the most part, has been on the brink of bankruptcy.

Adv. Dkt. No. 68, Tr.'s Resp. to Summ. J. Mot., Exs.  B-D.

Similar to the emails cited by the Liquidating Trustee, the statements made by the Bingham Greenebaum  attorneys in the TRO lawsuit filings can be reasonably interpreted to further impute constructive knowledge of the voidability of the Settlement Transfer.  Although many of the statements made by Bingham Greenebaum's attorneys in the district court filings make reference to Plaintiff's "affiliates" and "ECR's companies," the 2008 Going Concern Letter specifically references that AppFuels had "mounting losses and was in dire financial conditions" and apparently

had not resolved its cash flow problems until the time it received the Noble Energy funds, if even then. Under one reasonable interpretation of the evidence, Bingham Greenebaum had constructive knowledge of the potential avoidance of the Settlement Transfer.

To counter the Liquidating Trustee's evidence as to the insolvency issue, Bingham Greenebaum submitted the transcript of a telephonic conference call held on October 8, 2008 in the TRO lawsuit. United States District Court Judge David L. Bunning specifically asked counsel for ECR to address the insolvency issue. ECR's counsel responded that there were no insolvency issues:

> CROCKETT: And so I can sit here and tell you that if it turns out that the Court determines that we are obligated to pay the 10 million and the 4 million, then plaintiffs are prepared to do that at whatever time the Court makes that decision.
>
> There is litigation out there pending against us. Coal supply agreements are always in litigation. Some of the matters that have been set forth on this attachment have been resolved. Some have been dismissed. And so -- we're a coal company. We're in litigation all the time, as Paonia well knows. So there's just no - there's no support for the proposition that the plaintiff won't be in a position to pay the liquidated damages provision if the Court determines that it's possible.

Adv. Dkt. No.78, Bingham Greenebaum's Reply Br., Ex. A, p. 16. The District Court denied Paonia's request for injunctive relief holding that there was no "support [for] such a finding sufficient to warrant the expedited specific performance." *Id*. at 26. The district court pointed out that while there were lawsuits filed against ECR and related entities seeking judgments, there were no actual judgments against those parties. *Id*. at 27. However, following that conference, on October 27, 2008, Bingham Greenebaum sent discovery that referenced the previously discussed 2007 and 2008 going concern letters. Moreover, the injunctive relief for specific performance was an expedited remedy, and the court's denial did not resolve the entirety of the TRO lawsuit or the question of Bingham Greenebaum's constructive knowledge of voidability or any entity's solvency.

Finally, Bingham Greenebaum alleged in the TRO lawsuit that Stephen Addington, or the Addington family, wanted to sell the Bowie mine to another party, had two previous corporate entities that owned the Bowie mine wind up in Chapter 11, and had repurchased the Bowie mine from those bankruptcy estates through newly formed corporate entities. In essence, Addington, at

21

least as Bingham Greenebaum alleged and believed, had gone to great lengths to preserve maximum value for the Bowie mine in the past. This fact suggests that the paramount concern was effectuating the Settlement Agreement by paying the $4.7 million to Paonia and not whether AppFuels, as a separate corporate entity, was receiving any consideration for the payment that it needed more time to fund.

All this evidence in its totality shows a triable issue as to the § 550(b)(1) good faith transferee defense. Unlike other instances concerning law firms as mediate transferees, Bingham Greenebaum possessed more specific information in these circumstances. First, as discussed, the Liquidating Trustee provided evidence that Bingham Greenebaum knew or had reason to know that AppFuels might be insolvent from the references in its filings about the 2008 going concern letter from Ernst and Young. *See* 11 U.S.C. § 548(a)(1)(B)(ii). Bingham Greenebaum knew AppFuels would have difficulty paying the settlement unless and until it received the $4 million payment from Noble Energy and, despite this fact, it was paying the settlement as a nonparty to the TRO lawsuit and the settlement.

Second, for purposes of summary judgment, the record shows Bingham Greenebaum was aware that AppFuels was not a party to the TRO lawsuit or the Settlement Agreement. Fleischman was personally involved in drafting the Settlement Agreement that never mentions AppFuels paying the settlement or in any other context. *Cf. Nordic Village,* 915 F.2d at 1056 ("It is not an ordinary business practice for corporate entities to pay one another's taxes."). The fact that Fleischman stated in his deposition he was not paying attention (due to a vacation or otherwise), or simply did not care about who made the payment, does not remove the question of constructive knowledge.

Third, Judge Bunning's ruling, while certainly a probative fact in the record to be considered at trial, does not negate all the other facts as to Bingham Greenebaum's knowledge of AppFuels' financial circumstances and relationship to the Settlement Transfer.

Fourth, while it is possible inter-company transfers or some other legitimate arrangement might have explained why AppFuels, without any discernable consideration, paid the settlement contingent upon a payment of a specific third party receivable, it is also reasonable to infer the

payment was made instead to preserve value in Bowie or protect other Addington-controlled corporate entities. For purposes of summary judgment, this inference cannot be dismissed as a mere scintilla, nor can all the other discussed facts be explained away without some weighing of the evidence.

In short, while the evidence may ultimately support a judgment in favor of Bingham Greenebaum at trial, the evidence cannot be weighed in Bingham Greenebaum's favor at this stage. A genuine dispute as to material fact exists concerning Bingham Greenebaum's constructive knowledge and cannot be resolved on summary judgment.

**CONCLUSION**

For the foregoing reasons, the Panel REVERSES the bankruptcy court's order granting Bingham Greenebaum's Renewed Motion for Summary Judgment and REMANDS the adversary proceeding to the bankruptcy court for proceedings consistent with the Panel's decision.